[Civ. No. 48048. Second Dist., Div. Five. Dec. 16, 1976.]

BARRY J. RICHARDS, Plaintiff and Respondent, v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al.,
Defendants and Appellants.

## COUNSEL

MacDonald, Halsted & Laybourne and Peter Brown Dolan for Defendants and Appellants.

Bodle, Fogel, Julber, Reinhardt & Rothschild and Joel N. Klevens for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—Plaintiff Barry J. Richards filed a breach of contract action against defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., and several employees (hereinafter, Merrill Lynch) involving an alleged breach of a margin agreement. Merrill Lynch moved to stay the proceedings and petitioned the court for an order compelling arbitration. The motion and petition were denied on the ground that the agreement on which Merrill Lynch relied in seeking arbitration was a contract of adhesion, enforcement of which would deny plaintiff due process. Merrill Lynch has appealed.

### FACTS

In 1972, plaintiff entered into a margin agreement with Merrill Lynch. The agreement is contained on a 4 × 6-inch card, the reverse of which contains 41 lines of print, including the following: "It is agreed that any controversy between us . . . shall be submitted to arbitration conducted

under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, . . ."

The New York Stock Exchange ("Exchange" or "NYSE") rules provide, in relevant part, as follows: First, the dispute shall be submitted to a panel of five arbitrators, chosen by lot from the New York Stock Exchange Board of Arbitration, and/or each of two panels of arbitrators. (New York Stock Exchange Const., art. VIII, § 6; Board of Governors rule 484.) All arbitrators have been appointed by the chairman of the Board of Governors of the Stock Exchange. (§ 4.)

Second, controversies "shall be heard in New York City, except, where controversies involve any parties who are located outside of New York City, the Exchange *may,* at the request of the non-member, designate some other place in the United States." (Rule 484; see § 6. Italics added.)

Third, the Board of Governors of the New York Stock Exchange "may from time to time amend, alter or repeal any of the Rules of the Board with respect to arbitration, either generally *or in reference to a particular case,* as it in its sole discretion may find expedient." (Italics added.)

## DISCUSSION

 The issue is whether the agreement to arbitrate is unenforceable, because that agreement, drafted by a member of a private association (see *Silver* v. *New York Stock Exchange* (1963) 373 U.S. 341, 350-351 [10 L.Ed.2d 389, 396-397, 83 S.Ct. 1246]) compels a nonmember to arbitrate under rules that appear to be, as applied to a reluctant nonmember, fundamentally unfair. We conclude that the agreement as drafted is unenforceable.

In sum, the Exchange rules provide for arbitration of a California contract in New York, by arbitrators chosen by the New York Stock Exchange, under rules changeable at any time, including "in reference to a particular case, . . ."

We recognize that the rules permit the Exchange to designate a place of arbitration other than New York, and that Merrill Lynch predicts that

arbitration proceedings would be held in Los Angeles.[1] The prediction, however, is no warranty; it is not even a promise that Merrill Lynch has the power to perform.

In any event, if the situs of the arbitration were the sole sticking point, the problem could probably be solved by ordering arbitration to proceed, conditional on the Exchange choosing a California venue. We are, however, far more concerned with the Exchange's power (1) to select the arbitrators; and (2) to change the rules "in reference to a particular case."

As to (1), we recognize that any given panel of arbitrators is selected by lot, and Exchange rules permit arbitration panels consisting of a majority of persons not engaged in the securities business. (§§ 4, 6; rule 484.) These factors do not affect the basic apparent unfairness in requiring the nonmember to submit to arbitrators, all of whom have been appointed by the Exchange of which Merrill Lynch is a member.[2]

Even if somehow that rule, standing alone, would not vitiate arbitration under NYSE auspices, the rule that provides that the board of governors may amend "any" rule, either generally or "in reference to a particular case, as it in its sole discretion may find expedient," is fatal. It evokes the image of a poker game played with changing wild cards known only to the player who declares himself the winner.

We do not suggest that the rules are necessarily unfair in application. In particular, we have no reason to believe that the NYSE board will promulgate special rules for this controversy. However, "justice should not only be done, but should manifestly and undoubtedly be seen to be done." (*Rex* v. *Sussex Justices* (1924) 1 K.B. 256, 259 (Lord Hewart).) It is the potential that offends, particularly where, as here, the fine print which is claimed to be an agreement to abide by those rules only

---

[1]Counsel for Merrill Lynch declared, in substance, that during a period of five years preceding, whenever a customer requested that arbitration be held in Los Angeles the Board of Governors of the New York Stock Exchange so directed. Counsel also declared that Merrill Lynch would request the arbitration director of the New York Stock Exchange to set the proceedings in Los Angeles.

[2]In contrast, the Code of Civil Procedure provides for the parties to agree upon an arbitrator, and if the "agreed method fails," for the court to appoint one. (Code Civ. Proc., § 1281.6.) Similarly, the rules of the American Arbitration Association provide for the parties to choose and agree upon the arbitrator. (AAA Commercial Arbitration Rules (CAR), § 12.)

incorporates them by reference. We do not imply that agreements to arbitrate must set forth the rules under which arbitration is to proceed. ▮ ▮▮▮When, however, the agreement is intended to encompass rules such as the NYSE rules under discussion—an "in house" arbitration in which an association of which Merrill Lynch is a member appoints the arbitrators and can change the groundrules on a game-by-game basis—something more than a casual reference by incorporation is called for.[3]

▮ The issue, we emphasize, is not the fairness of the New York Stock Exchange rules in practice, but the imposition of those rules on plaintiff by Merrill Lynch. The Exchange did not impose itself upon plaintiff; to the contrary, Exchange rules permit arbitration of controversies between members and nonmembers only "at the instance of such non-member, . . ." (Art. VIII, §§ 5, 6.)[4] Indeed, one commentator has written approvingly: "The availability of arbitration to nonmembers and also the option for selection of the arbitral tribunal shows the sensitive attitude of the Stock Exchange towards the claims or grievances voiced by nonmembers that may endanger the status of the institution and the image of the groups involved." (Domke, The Law and Practice of Commercial Arbitration (1968) § 5.04, p. 44.) Apparently few members insist that customers arbitrate under Exchange rules. Rather, according to Professor Domke, the "clause in use in Customer's Agreements of brokerage houses reads as follows: [¶] 'Any controversy . . . shall be settled by arbitration, in accordance with the rules, . . . of *either* . . . the American Arbitration Association, *or* the Arbitration Committee of the New York Stock Exchange, *as I may elect.*' "[5] (*Ibid.* Italics added.)

---

[3] "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." (*Scott's V.F. Exch.* v. *Growers Refrig. Co.* (1947) 81 Cal.App.2d 437, 447 [184 P.2d 183]; compare *Hischemoeller* v. *Nat. Ice etc. Storage Co.* (1956) 46 Cal.2d 318, 328 [294 P.2d 433] ["The facts in the present case disclose an ordinary business transaction between businessmen."]. See *Muelder* v. *Western Greyhound Lines* (1970) 8 Cal.App.3d 319, 331-334 [87 Cal.Rptr. 297].)

[4] Apparently the Exchange interprets a card such as the one signed by plaintiff as calling for arbitration "at the instance" of the nonmember.

[5] The author refers us to *Stockwell* v. *Reynolds & Co.* (S.D.N.Y. 1965) 252 F.Supp. 215, 220; see similar agreements in *Vernon* v. *Drexel Burnham & Co.* (1975) 52 Cal.App.3d 706, 711, fn. 2 [125 Cal.Rptr. 147]; *Arrieta* v. *Paine, Webber, Jackson & Curtis, Inc.* (1976) 59 Cal.App.3d 322, 325 [130 Cal.Rptr. 534].

The cases which Merrill Lynch describes as being "squarely on point," are not. None even touches on the lode of potential unfairness of the Exchange rules which are the heart of plaintiff's resistance to arbitration. In *Berman* v. *Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999 [119 Cal.Rptr. 130], the issue was whether the particular dispute was subject to arbitration, and not whether the arbitration agreement, as such, was fundamentally unfair. Merrill Lynch, in pointing out that the agreement in *Berman* also involved "New York," misses the point made by the court: "Although the contract contains a provision that its enforcement shall be governed by New York law, plaintiffs"—who opposed arbitration—"have blown hot and cold as to whether they wish New York or California law to be applied. In any event, . . . in all material aspects the law of both jurisdictions is the same." (*Id.,* at p. 1003.)

*Vernon* v. *Drexel Burnham & Co., supra,* 52 Cal.App.3d 706, provides even less support for Merrill Lynch. There the issue was whether an arbitration agreement controlled in face of the plaintiff's desire to bring a class action. (*Id.,* at pp. 715-716.) The court also held that no basis existed "in the present case for employment of the doctrine of adhesion contracts to avoid arbitration . . . ," but the arbitration clause in that case did not limit the procedures to those provided by the Exchange but gave the customer the usual election. (*Id.,* at p. 713; see fn. 5, *supra.*)

*Lewsadder* v. *Mitchum, Jones & Templeton, Inc.,* 36 Cal.App.3d 255, 257 [111 Cal.Rptr. 405], did involve an agreement to arbitrate under NYSE rules, but there it was a registered representative of the broker who resisted arbitration in the face of an Exchange rule—a condition of his employment—that controversies between such representatives and member brokers be arbitrated in accordance with Exchange procedures. (See also *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 20 Cal.App.3d 668, 671-672 [97 Cal.Rptr. 811].) In any event, again there was no issue concerning the unfairness of particular Exchange rules concerning arbitration.

Merrill Lynch relies on the rule that failure to read an agreement is not, without more, a basis for voiding it. While a mere inspection of this "agreement" indicates that it probably was not meant to be read,[6] the

---

[6]In 1975, the Legislature added Code of Civil Procedure section 1295 which governs the form and contents of a contract for medical services which contains an arbitration provision. In contrast to the agreement in this case, section 1295, subdivision (b), provides: "Immediately before the signature line provided for the individual contracting

argument misses the point. It is not what the arbitration paragraph says that is unfair, but what it does not set forth: the Exchange rules concerning arbitration which are the rationale of our holding that Merrill Lynch is not entitled to arbitration as demanded.

We conclude therefore that the portion of the agreement which calls for "arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock "Exchange," is invalid.

■ This does not necessarily mean that on a proper showing Merrill Lynch would not be entitled to arbitration under more conventional auspices than the NYSE rules. Having in mind the strong policy in favor of arbitration (see *Madden* v. *Kaiser Foundation Hospitals,* 17 Cal.3d 699, 706 [131 Cal.Rptr. 882, 550 P.2d 1178]), the agreement to arbitrate as such—if otherwise found to be untainted—appears to be severable from the incorporation of the NYSE rules. If the naked agreement to arbitrate is valid, and the parties cannot agree on a method of proceeding, the solution is provided by statute. (See Code Civ. Proc., §§ 1281.6, 1282-1284.2.)

Our affirmance of the order denying arbitration is therefore without prejudice to a renewal of defendants' motion promptly after our remittitur. Plaintiff may, of course, oppose a renewed motion on all available grounds.[7]

The order denying arbitration is affirmed.

Stephens, J., and Ashby, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 23, 1977.

---

for the medical services must appear the following in at least 10-point bold red type," and a "NOTICE," in prescribed language making clear that the patient by signing has agreed to have any issue of medical practice decided by neutral arbitration and is giving up a right to a jury or court trial.

[7]Although it appears fairly clear that plaintiff does not want arbitration on any terms, the entire thrust of the opposition, both below and here, has been the invalidity of compelled arbitration under NYSE rules. Shorn of that aberration, the agreement to arbitrate is similar to the one described and upheld in *Vernon* v. *Drexel Burnham & Co., supra,* 52 Cal.App.3d 706, 711, fn. 2, 713-714) which plaintiff himself compares favorably with the one in issue.