[Civ. No. 47841. First Dist., Div. One. July 29, 1981.]

ROBERT W. HOPE et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
SHEARSON HAYDEN STONE, INC., et al., Real Parties in
Interest.

COUNSEL

Trepel & Clark, Trepel, Clark & Manley, John W. Clark and George M. Kraw for Petitioners.

No appearance for Respondent.

Michael M. Gless, Robert D. Feighner and Keesal, Young & Logan for Real Parties in Interest.

OPINION

GRODIN, J.—In *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165], the California Supreme Court es-

tablished certain guidelines for determining when an arbitration agreement constitutes an unenforceable contract of adhesion. In this proceeding we are called upon to apply those guidelines to contracts of employment between a securities brokerage firm and two of its account executives, calling for settlement of a broad range of disputes through arbitration procedures prescribed in the constitution and rules of the New York Stock Exchange. We shall hold that the agreement for arbitration in this case is a contract of adhesion under applicable principles, and that the procedures for arbitration prescribed by the constitution and rules of the New York Stock Exchange are so one-sided, as applied to employer-employee disputes, as to render the agreement unenforceable.

*Background.*

Petitioners Robert W. Hope and K. James Pond were employed as account executives in the Palo Alto office of real party in interest Shearson Hayden Stone, Inc. (Shearson). In February 1979, they were both given the option of resigning or being terminated. They left, went to work for a competitor of Shearson's, and later sued Shearson in respondent superior court claiming that Shearson owed them more than $100,000 for commissions. They also claimed that Shearson had tortiously interfered with their advantageous business relationships and engaged in unfair competition by misrepresenting their honesty and skill to Shearson's clients, by making false and derogatory comments about their abilities and experience to local brokerage firms, and by delaying or refusing to transfer accounts to their new brokerage firm.

Shearson moved to stay the proceedings (Code Civ. Proc., § 1281.4) and to compel arbitration (Code Civ. Proc., § 1281.2) on the basis of a provision contained in a seven-page "Application for Approval of Employment" which each petitioner had signed when he was first employed by Shearson. The application is a form (No. RE-1) supplied by the New York Stock Exchange, of which Shearson is a member. The provision reads: "I agree that any controversy between me and any member or member organization or affiliate or subsidiary thereof arising out of my employment or the termination of my employment shall be settled by arbitration at the instance of any such party in accordance with the arbitration procedure prescribed in the Constitution and rules then obtaining of the New York Stock Exchange, Inc."

The constitution of the New York Stock Exchange is a formidable document of some 70 pages. Provisions relating to arbitration are found in article VIII.[1] Under these provisions, the chairman of the board of directors of the exchange (subject to approval by the board itself) appoints a board of arbitration composed of such number of members and allied members of the exchange as he deems necessary, and two panels of arbitrators "composed of persons who are residents of or have their places of business in the Metropolitan area of the City of New York." The first panel is composed of persons engaged in the securities business, and the second of persons not so engaged. The chairman is empowered to appoint similar panels to serve outside the City of New York. In addition, he is called upon to designate one of the officers or other employees of the exchange as arbitration director.

Controversies between a nonmember and a member of the exchange (as in the present case), unless they involve a public customer or less than $100,000, are heard and determined by five arbitrators selected by the arbitration director, at least three of whom must be from the second panel unless the nonmember requests a greater number from the first panel. Such arbitration proceedings are to be held "where designated by the Exchange" and conducted "in such manner and pursuant to such rules as the Board of Directors shall from time to time adopt." Subject to rules of the board, the arbitrators determine the amount chargeable to the parties as costs, to cover the expense of the hearings.

Current rules of the board pertaining to arbitration provide that a party may peremptorily challenge one member of the arbitration panel. In addition, arbitrators are required to disclose to the director of arbitration "any circumstances which might preclude such arbitrator from rendering an objective and impartial determination," and the director is empowered to remove "an arbitrator who discloses such information." The rules also contain a schedule of fees which must be deposited by a claimant with the exchange in advance of arbitration, unless the deposit is waived by the director of arbitration. Where the amount in dispute is $100,000 and over, the amount of the required deposit is $550.

Petitioners argued to the trial court, among other things, that they never saw the relevant provisions of the exchange's constitution

[1]Article VIII, and the rules of the board of directors pertaining to arbitration, have been amended in certain relevant respects since the trial court's ruling. The parties stipulated at oral argument that the case should be decided on the basis of the current rules.

and bylaws, and that in any event they should not be bound by those provisions, which were adhesive and unfair. When the trial court ordered arbitration nevertheless, petitioners sought relief through a petition for writ of mandate, filed in this court[2] and then in the Supreme Court. The Supreme Court issued an alternative writ and, after its decision in *Graham* v. *Scissor-Tail, Inc., supra*, 28 Cal.3d 807, transferred the case to this court for reconsideration and determination in light of that opinion.

At oral argument before this court, the parties agreed that under Labor Code section 229, as applied in *Ware* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 43-45 [100 Cal.Rptr. 7913], affirmed 414 U.S. 117 [38 L.Ed.2d 348, 94 S.Ct. 383], petitioners' claim against Shearson for commissions due is exempt from arbitration as a matter of state policy.[3] ■ This leaves at issue petitioners' tort claims for interference with advantageous business relationships and unfair competition. Petitioners' contention that these claims are not within the scope of arbitration is without merit: the arbitration provision contained in the employment application form is broadly phrased to include "any controversy . . . arising out of my employment *or the termination of my employment*" (italics added), and in *Lewsadder* v. *Mitchum, Jones & Templeton, Inc., supra*, 36 Cal.App. 3d at page 259, an agreement which did not contain the emphasized language was held broad enough to include tort claims arising out of termination. We therefore proceed to consider the issues posed by the Supreme Court's transfer order.

[2]Petitioners named J. Barry Gray, an executive of Shearson, as a defendant in the underlying lawsuit, and the trial court had ordered arbitration as to Gray as well as to Shearson. This court issued a peremptory writ of mandate directing the trial court to vacate its order as to Gray, on the ground that Gray was not a party to the arbitration agreement. The propriety of that determination is no longer an issue in this case. This court denied relief as to Shearson on the authority of *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668, 672 [97 Cal.Rptr. 811], and *Lewsadder* v. *Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 259 [111 Cal.Rptr. 405].

[3]Section 229 provides: "Actions to enforce the provisions of this article for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate. This section shall not apply to claims involving any dispute concerning the interpretation or application of any collective bargaining agreement containing such an arbitration agreement." The Court of Appeal in *Ware* determined that the intent of this provision "is to provide in the first instance a judicial forum where there exists a dispute as to wages" (24 Cal.App.3d 35, at p. 43), and thus to bar arbitration of a claim by employees of a stock brokerage firm for benefits under a profit sharing plan. That decision was affirmed by the United States Supreme Court, as against a contention by the brokerage firm that California's

*The Scissor-Tail Opinion.*

In *Graham* v. *Scissor-Tail, Inc., supra*, 28 Cal.3d 807, Bill Graham, promoter and producer of musical concerts, entered into a series of contracts with a group of musicians and their representatives on forms provided by the American Federation of Musicians (A.F. of M.), a labor union which included the contracting musicians as members. The forms contained several blanks, in which the parties inserted the terms of their agreement, but they also included certain printed clauses, among which was one to the effect that all controversies arising out of the agreement would be submitted to the international executive board of the A.F. of M., pursuant to the constitution, bylaws, rules and regulations of that union, for its final and binding determination. The parties failed to make explicit provision as to how net losses should be distributed, and when a dispute arose over that matter Graham filed a lawsuit. The musicians and their representatives responded with a petition to compel arbitration, the trial court ordered arbitration before the international executive board, and that tribunal, after hearing by a referee which it appointed, ultimately awarded $53,000 against Graham. That award was confirmed by a superior court as an arbitration award, and Graham appealed.

The Supreme Court first determined that the contracts involved were, in light of all the circumstances, contracts of adhesion, i.e., "'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. [Citation].'" (*Id.*, at p. 817.) While Graham was a successful and prominent promoter, he was "required by the realities of his business as a concert promoter to sign A.F. of M. form contracts with *any* concert artist with whom he wished to do business," and the fact that he may have possessed considerable bargaining strength with respect to other provisions of the contracts did not remove the taint of adhesion from the provisions complained of. (*Id.*, at pp. 818-819.)

The court went on to observe that, while the adhesive character of a contract will not itself preclude enforcement, "there are two judicially

policy conflicted impermissibly with federal policy favoring arbitration of disputes involving the New York Stock Exchange (414 U.S. 117). The term "wages" is defined in Labor Code section 200 as including "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, *commission basis*, or other method of calculation." (Italics added.)

imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations; fn. omitted.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' [Citations]." (*Id.*, at p. 820.)

Finally, the court concluded that the contractual provision requiring arbitration of disputes before the A.F. of M., while not contrary to the reasonable expectations of the parties, was nevertheless unconscionable, and therefore unenforceable "because it designates an arbitrator who, by reason of its status and identity, is presumptively biased in favor of one party." (*Id.*, at p. 821.) Though the California Arbitration Act does not strictly preclude parties from designating a nonneutral arbitrator "when . . . the contract designating such an arbitrator is the product of circumstances suggestive of adhesion, the possibility of overreaching by the dominant party looms large; contracts concluded in such circumstances, then, must be scrutinized with particular care to insure that the party of lesser bargaining power, in agreeing thereto, is not left in a position depriving him of any realistic and fair opportunity to prevail in a dispute under its terms." (*Id.*, at pp. 824-825.) Thus, "certain 'minimum levels of integrity' [must] be achieved if the arrangement in question is to pass judicial muster." (*Id.*, at p. 825.) And the court held, "an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment—especially when, as here, the arrangement is the product of circumstances indicative of adhesion" fails to meet that standard. (*Id.*, at p. 827.)

*Application of Scissor-Tail.*

 Here, as in *Scissor-Tail*, the contract containing the arbitration provision was adhesive in nature. It consisted of a standard employment application form, prepared by the New York Stock Exchange, and imposed by Shearson upon all applicants for employment. Shearson does not claim that petitioners had any options other than "to adhere to the contract or reject it." (28 Cal.3d at p. 817.) Petitioners' bargaining strength in relation to Shearson was patently less than was Graham's in relation to the musicians and their representatives.

██ We must also conclude on the basis of the standards set forth in *Scissor-Tail* that the arbitration provisions contained in the contract were unconscionable, and therefore unenforceable. Whether or not those provisions were contrary to the reasonable expectations of the parties is an issue we cannot determine on this record; but here, as in *Scissor-Tail*, the arbitral body is so associated with a party to the contract, i.e., Shearson, as to be presumptively biased in favor of that party.

The board of directors of the New York Stock Exchange consists of 20 directors elected by members of the exchange and a chairman of the board elected by the board. Ten of the directors are required to be representatives of the public, none of whom are, or are affiliated with, brokers or dealers in securities; the remaining ten must be members or allied members of the exchange bearing specified relationships to member corporations or firms. The constitution provides for "allied members" and this category of membership can include a principal executive officer of a member corporation, or a person who controls such a corporation, but it does not include employees in the category of petitioners, and even "allied members" do not vote for the board of directors.

The New York Stock Exchange, and thus its board of directors, performs a variety of quasi-public functions; but insofar as the board of directors functions in disputes between member firms and their employees, it is presumptively biased in favor of management in the same way that the Supreme Court deemed the international executive board of the A.F. of M. to be presumptively biased in favor of member musicians. This is not to say that members of the board of directors are in fact biased, or that they would necessarily exercise their authority in a consciously biased fashion; it is to say that the structure of governance of the exchange is such that there exists a presumptive *institutional* bias in favor of member firms and members who constitute the electoral constituency of the board. Petitioners, being outside that constituency (cf. *Gear* v. *Webster* (1968) 258 Cal.App.2d 57 [65 Cal.Rptr. 255]; *Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 822) have legitimate cause to complain.

It does not serve adequately to distinguish *Scissor-Tail* that the arbitration tribunal in that case was the governing board of the union while here it is not the board itself but a panel of arbitrators appointed by the chairman with the approval of the board. The presumption of bias does

not disappear simply because the decisional power is delegated. Nor is the presumption dispelled by rules requiring the arbitrators to be persons not engaged in the securities business, or giving the nonmember one peremptory challenge, or granting the director of arbitration authority to disqualify an arbitrator. Evenhandedness could be assured by a procedure which permits selection of arbitrators by the parties to the dispute or, failing that, through the auspices of some truly neutral party. In the absence of such a procedure we must conclude, as in *Scissor-Tail*, that the arbitration procedures of the New York Stock Exchange fail to meet minimal levels of integrity.

In *Scissor-Tail* the court remanded with instructions that the trial court should afford the parties a reasonable opportunity to agree on a suitable arbitrator and, failing such agreement, the court itself should on petition of either party appoint the arbitrator. (28 Cal.3d at p. 831.) Neither party requests such a procedure here. Moreover, arbitration of the tort issues would be somewhat complicated by the nonarbitrable nature of related issues based upon petitioners' claim for commissions due. We consider that justice would be better served in this case by allowing petitioners to proceed with their action in court.

Accordingly, a peremptory writ will issue requiring the respondent court to vacate its order of July 10, 1979, granting the petition of real parties in interest for an order to arbitrate the dispute therein pursuant to the rules of the New York Stock Exchange, and to enter an order denying said petition.

Elkington, Acting P. J., and Newsom, J., concurred.

The petition of real parties in interest for a hearing by the Supreme Court was denied October 14, 1981.