[Civ. No. 54197. First Dist., Div. One. Jan. 26, 1983.]

MYRON R. PARR, Petitioner, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al.,
Real Parties in Interest.

---

**COUNSEL**

Stanwood & Price and Daniel R. Price for Petitioner.

No appearance for Respondent.

W. Reece Bader, Ronald Hayes Malone, James A. Hughes and Orrick, Herrington & Sutcliffe for Real Parties in Interest.

---

**OPINION**

**HOLMDAHL, J.**—By petition for writ of mandate, Myron Parr (petitioner) asks us to command the respondent court to reverse its order compelling arbitration of his dispute with Merrill Lynch, Pierce, Fenner & Smith, Inc. (real party). The proceeding here arises from a superior court action for rescission and damages, filed by petitioner against real party.

This court originally denied petitioner's request for an alternative writ, but upon his application to the Supreme Court hearing was granted and the case was returned to us "for reconsideration in light of *Graham* v. *Scissor-Tail, Inc.*, (1981) 28 Cal.3d 807, and *Hope* v. *Superior Court* (1981) 122 Cal.App.3d 147." We issued an alternative writ on June 18, 1982.

Upon further consideration, we now again conclude that petitioner is not entitled to the relief he seeks.

### STATEMENT OF FACTS

The facts are undisputed. In 1980, the parties entered into a written contract whereby petitioner was granted a "Cash Management Account" (CMA). This CMA was to consist of several elements, including a "securities account"; a "money trust account" earning interest on certain money, apparently that deposited by petitioner which was not invested, at any given time, in securities;

and a checking account permitting petitioner to write checks against his deposits. The contract included an arbitration clause, which we set forth below.[1]

About April of 1981, real party concluded that petitioner was using the CMA solely as a checking account. Purportedly real party attempted, unsuccessfully, to notify petitioner that it had decided, pursuant to one of the contract terms, to terminate the contract. Real party then terminated the contract without further attempt to notify petitioner. Thereafter, three checks, totalling about $150,000, were dishonored. Petitioner covered the checks, then filed this action for fraud, infliction of emotional distress, and rescission. He also sought exemplary damages.

Real party answered the complaint and filed a motion to compel arbitration on the same date. The court, after a hearing, granted that motion by order dated September 30, 1981.

## CONTENTIONS OF THE PARTIES

Petitioner contends that this case is governed by state law adhesion contract principles as refined in *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165], and that those principles require that we deem the arbitration clause unenforceable.

Real party's principal contention is that the doctrine of federal preemption renders state adhesion contract principles irrelevant, and that relevant federal law supports the trial court's order.[2] Real party argues, alternatively, that even under state law, the trial court's order was correct.

---

[1]"Agreement to Arbitrate Controversies. It is agreed that any controversy between us arising out of your business or this agreement shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc., as the undersigned may elect. If the controversy involves any security or commodity transaction or contract related thereto executed on an exchange located outside the United States, then such controversy shall, at the election of the undersigned, be submitted to arbitration conducted under the constitution of such exchange or under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. Arbitration must be commenced by service upon the other of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the undersigned does not make such designation within five (5) days of such demand or notice, then the undersigned authorizes you to do so on behalf of the undersigned."

[2]The parties have analyzed in depth the preliminary question of whether the doctrine of federal preemption renders state adhesion contract principles irrelevant, requiring us to look solely to federal law. To undertake such an inquiry would seem to be a departure from the express directive (quoted *ante,* p. 442) we received from the Supreme Court.

In any event we are satisfied, as our Supreme Court seems to be (cf. *Keating* v. *Superior Court* (1982) 31 Cal.3d 584, 593-595 [183 Cal.Rptr. 360, 645 P.2d 1192]), that facts such as

■ We agree with petitioner that the contract herein is an adhesion contract and that *Scissor-Tail* and the cases succeeding it are determinative of our decision in this case. Applying the principles of those cases, however, requires us to conclude that the trial court's order was correct and that the petition for writ of mandate should be denied.

### CONTRACT OF ADHESION

Real party argues that the contract in this case was not one of adhesion, and contends that petitioner had the option of going to various other brokerage houses to accomplish his ends. Therefore, it argues, petitioner's opportunity to choose made this contract nonadhesive.

Real party misconstrues the test of adhesion. Were its view correct, every insurance contract—the paradigm adhesion contract—would necessarily be deemed nonadhesive. (Cf. Sybert, *Adhesion Theory in California: A Suggested Redefinition and its Application to Banking* (1978) 11 Loyola L.A. L. Rev. 297, 310-311.)

■ A contract of adhesion is "'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 817, quoting *Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) The adhering party's freedom to choose not to contract at all is irrelevant. The question is whether he is free to negotiate and alter the printed terms of the proffered agreement.

■ We find here, as the courts necessarily did in *Scissor-Tail, Hope,* and *Keating* v. *Superior Court* (1982) 31 Cal.3d 584 [183 Cal.Rptr. 360, 645 P.2d 1192], that the contract was one of adhesion. For this finding we need merely fit the words of the *Keating* court to the instant facts: "[i]t is undisputed that the [CMA agreement] in question here [is] standardized in form, at least as regards the arbitration provision; and that [it was] drafted and imposed by defendant, a large corporation of vastly superior bargaining strength, upon all parties desiring a [CMA]." (*Id.,* at p. 593.)

■ Having done so, however, it becomes necessary to determine whether the arbitration provision of the contract is nevertheless enforceable. ■

those before us do not trigger the preemption doctrine. (See generally, *Texas Industries, Inc.* v. *Radcliff Materials* (1981) 451 U.S. 630, 640-641 [68 L.Ed.2d 500, 508-509, 101 S.Ct. 2061]; *Alessi* v. *Raybestos-Manhattan, Inc.* (1981) 451 U.S. 504, 522 [68 L.Ed.2d 402, 416, 101 S.Ct. 1895]; *Prima Paint* v. *Flood & Conklin* (1967) 388 U.S. 395, 420-425 [18 L.Ed.2d 1270, 1286-1289, 87 S.Ct. 1801] [Black, J., dis.]; *Erie R. Co.* v. *Tompkins* (1938) 304 U.S. 64, 78 [82 L.Ed. 1188, 1194, 58 S.Ct. 817, 114 A.L.R. 1487].)

Thus, *Scissor-Tail* established that "there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' [Citations.]" (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 820.)

We now review the application of these "two judicially imposed limitations" to the case before us.

REASONABLE EXPECTATIONS OF THE "ADHERING" PARTY

Petitioner contends, essentially, that he had no notice of the arbitration clause and had no expectation that in the event of a dispute he would be precluded from seeking remedies in court. He further claims that he "did not read said clause" concerning arbitration.

*Scissor-Tail* denominates notice as being "simply one of the factors—albeit an extremely significant one—to be weighed in assessing the reasonable expectations of the 'adhering' party. [Citation.]" (28 Cal.3d at p. 820, fn. 18.)

While *Scissor-Tail* confines the adequate notice element of "reasonable expectations" to a footnote, we recognize its great importance.

However, no factual finding is before us as to whether petitioner did or did not read the instant provision. It is before us that the business of the parties pursuant to the contract took place over some five months, with numerous transactions and large sums of money involved. There is no indication petitioner is anything but an experienced and sophisticated businessman; he certainly has not claimed to be unfamiliar with the English language nor the desirability of reading and understanding a contract before entering into one. He does not claim fraud in the inducement or any similar misconduct on the part of real party.

We also note and recognize the significance of the Supreme Court's observation that "provision for arbitration in a commercial context is quite common, and reasonably to be anticipated." (*Keating* v. *Superior Court, supra,* 31 Cal.3d 584, 595.)

Were we, therefore, to relieve petitioner of his contractual responsiblities on the basis that he "did not read said clause," we would necessarily have to ab-

solve from responsibility the "adhering" party to virtually all "contracts of adhesion," wherein the "adhering" party, no matter how experienced and sophisticated, claims that he did not read the contract or such portion of it as he may wish to avoid. At the same time, that very person, whether in fact he had read it or not, could choose alternatively to seek arbitration or, should he prefer, to perform and receive the benefits of the contract.

Such would not be a reasonable result, and we conclude, therefore, that petitioner does not qualify for relief under the "reasonable expectations" limitation on the enforceability of the adhesion contract before us.

### UNCONSCIONABILITY OF ARBITRATION REQUIREMENT

Petitioner argues also that enforcement of the arbitration provision would be unconscionable. We must, therefore, determine whether the " 'dispute settlement arrangements' " of the contract meet " 'minimum levels of integrity.' " (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 825.) At least twice recently, California courts have held that purported agreements to arbitrate disputes with a New York Stock Exchange (NYSE) member before a NYSE arbitrator were unenforceable.

Justice Kaus pronounced such a ruling before the *Scissor-Tail* case had formulated its test; for this reason his analysis made no reference to "conscionability" or to " 'levels of integrity,' " but it clearly fits within and accords with the *Scissor-Tail* conscionability test. (*Richards* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1976) 64 Cal.App.3d 899, 903-906 [135 Cal.Rptr. 26].) Following *Scissor-Tail,* Justice Grodin, speaking for this court, found such an arbitration clause unconscionable in an employment-termination setting because "there exists a presumptive *institutional* bias in favor of [NYSE] member firms and members who constitute the electoral constituency of the [NYSE] board." (*Hope* v. *Superior Court* (1981) 122 Cal.App.3d 147, 154 [175 Cal.Rptr. 851]; italics in original.)

In this case we reach the opposite result, although we approve of and reassert the presumptive bias test. The distinguishing feature of this case is that real party has effectively rebutted the presumption of unconscionability.

Real party has shown that the arbitration code which would govern in this instance is a relatively new creature, one which possesses "minimum levels of integrity." We take judicial notice of the essentially identical NYSE and National Association of Securities Dealers arbitration codes, which would govern the arbitration in this case at petitioner's election. (Cf. NYSE Rules, rules 600 et seq., ¶¶ 2600 et seq.) Moreover, we notice the Third Report of the Securities Industry Conference on Arbitration to the Securities Exchange Commission

(Jan. 31, 1980). This report indicates that the arbitration code in question was formulated at the instance of the Securities and Exchange Commission (SEC), and that it was approved by the SEC before it was adopted. (SR-NYSE-79-23, SEC Rel. No. 34-16390 (Nov. 30, 1979).)

The SEC is an agency of the federal government which bears as one of its most important duties the protection and enforcement of the public's interest in the area of securities. (See, e.g., 15 U.S.C. §§ 78j, 78k-1, 78*l*, 78o(c); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware* (1973) 414 U.S. 117, 128-130 [38 L.Ed.2d 348, 359-360, 94 S.Ct. 383]; 17 C.F.R. § 200.1 (d).) Without some basis for doing so, we are reluctant to find unconscionable procedures which have been approved by the SEC. We find that the procedures outlined in the NYSE rules display beyond any doubt much more than the requisite minimal integrity.

We note that a person such as petitioner is guaranteed the right to a panel of arbitrators a majority of whom must *not* be from the securities industry; the right peremptorily to challenge one of the arbitrators; the right to a hearing and to present evidence; the right to counsel; and the right to a verbatim record. Even without the SEC's imprimatur, we believe these rules measure up to the "minimum levels of integrity" described in *Scissor-Tail.*

By comparison, *Scissor-Tail* involved an arbitration provision designating the union of one of the parties as arbitrator of disputes under the contract. The union's arbitration rules permitted the " 'introduction and submission of evidence to the Board in the form of unsworn written statements, and waive[d] the taking of oral testimony and the presentation of oral argument before the Board.' " (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 826, fn. 24.)

We note that *Scissor-Tail* explicitly does not purport to invalidate all contracts of adhesion. This is so even as to contractual provisions for arbitration and even if the designated arbitrator has some relationship to one of the parties. Any such characteristic, of course, calls for close scrutiny as to the rules and procedures the arbitrator is to employ "to insure that the party of lesser bargaining power, in agreeing thereto, is not left in a position depriving him of any realistic and fair opportunity to prevail in a dispute under its terms." (*Id.,* at pp. 824-825.)

We conclude that the provisions for arbitration in the contract before us do provide petitioner with such "realistic and fair opportunity to prevail" and that, therefore, he does not qualify for relief under the "unconscionability" limitation on the enforceability of the adhesion contract before us.

## POLICY FAVORING ARBITRATION

*Scissor-Tail* alludes to the "strong public policy of this state in favor of resolving disputes by arbitration." (*Id.,* at p. 831.)

That case also requires that "a party resisting arbitration can show that the rules under which arbitration is to proceed will operate to deprive him of . . . the common law right of fair procedure . . . ." (*Id.,* at p. 826.)

Petitioner in the case before us has made no such showing.

In addition, *Scissor-Tail* prescribes that "[e]nforcement of an agreement to arbitrate should be denied . . . *only in the clearest of cases,* i.e., when the applicable procedures essentially preclude the possibility of a fair hearing. *In all other cases the matter should be permitted to proceed to arbitration.* If, in the course of arbitration proceedings, the resisting party is actually denied a fair opportunity to present his position, ample means for relief are available through a subsequent petition to vacate the award. (See Code Civ. Proc., §§ 1285.8, 1286.2, subd. (e).) (See and cf. *California State Council of Carpenters* v. *Superior Court* (1970) 11 Cal.App.3d 144, 162-163 [89 Cal.Rptr. 625].)" (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 826, fn. 23; italics added.)

Thus, while the effect of our decision is to require arbitration of the present dispute, and while we have previously concluded that the contract provides petitioner with the "realistic and fair opportunity to prevail" required by *Scissor-Tail,* we are aware that should that prove not to be the case, petitioner still has "ample means for relief . . . available through a subsequent petition to vacate the award." (*Ibid.*)

Accordingly, the petition is denied and the alternative writ is discharged.

Racanelli, P. J., and Newsom, J., concurred.