[No. D002997. Fourth Dist., Div. One. July 18, 1986.]

BERNARD L. LEWIS, Plaintiff and Respondent, v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,
Defendant and Appellant.

**COUNSEL**

Rogers & Wells, Charles R. Hartman, Terrence L. Bingman and Charles E. Wheeler for Defendant and Appellant.

Bernard L. Lewis, in pro. per., for Plaintiff and Respondent.

**OPINION**

**BUTLER, J.**—Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) appeals a denial of its petition to compel arbitration of Bernard L. Lewis's complaint alleging Merrill Lynch fraudulently calculated interest charges on the basis of a 360-day year on his margin and cash management account. We affirm, holding the arbitration forums in which the claim is required to be arbitrated are fundamentally unfair and the agreement to arbitrate before one of those forums is unenforceable, without prejudice to a renewal of a motion to arbitrate before an impartial arbitrator.

I

Lewis's complaint alleges it is filed on behalf of all customers of Merrill Lynch who purchase securities of any type on margin or are paying debts

to Merrill Lynch or are paying interest to Merrill Lynch. The first cause of action alleges Merrill Lynch charges interest in excess of the stated amount agreed to be charged customers by means of false and deceptive calculations. Lewis claims Merrill Lynch tells its customers interest will be charged at an annual rate. Customers receive a monthly statement showing the stated annual rate of interest for each day of the month computed on an average daily balance. The amount of interest charged is then shown on the statement. Merrill Lynch in fact charges the customer the stated rate of interest for 360 days but the actual amount is increased by $\frac{1}{72}$ of the interest rate shown, as the customer is charged 365 days times $\frac{1}{360}$ for each day's interest. The customer is not aware of the practice which Lewis claims is an unfair trade practice under Business and Professions Code section 17500 entitling customers to restitution. Lewis claims this practice results in an overcharge of more than $500,000 per year as to some 10,000 members of the class.

The second cause of action alleges like interest computations and overcharges as to a class consisting of Lewis and other customers who purchase U.S. Treasury bonds, notes, participation certificates, and corporate and municipal bonds.

## II

Merrill Lynch petitioned the court for an order to compel arbitration of the issues in the complaint and to stay proceedings. The petition ignored the class action aspects of the complaint and sought arbitration and the stay solely with respect to Lewis. In his answer to the petition, Lewis simply asked the court to deny the petition. His opposition points and authorities asserted the interest of the class could only be protected in the lawsuit, as individual arbitration as to each member of the 10,000-member class would be absurd. The court denied the petition, referring solely to Lewis and making no mention of the class. This appeal is from that order denying arbitration as to Lewis. While the complaint is couched in class action terms, Lewis and Merrill Lynch did not request class arbitration and neither sought class certification. Accordingly, we do not address arbitrability of the controversy as a class action, a matter to be considered, if at all, by the trial court.

## III

Lewis and other class members signed a Merrill Lynch customer agreement form. Paragraph 11 provides in relevant part: "It is agreed that any controversy between us arising out of your business or this agreement shall be submitted to arbitration conducted under the provisions of the Constitution

and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc., as the undersigned may elect. . . . Arbitration must be commenced by service upon the other of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the undersigned does not make such designation within five (5) days of such demand or notice, then the undersigned authorizes you to do so on behalf of the undersigned."

Merrill Lynch made a letter demand upon Lewis to submit his individual claim to arbitration and stated in the event Lewis did not select the New York Stock Exchange (NYSE) then Merrill Lynch elected arbitration under the National Association of Securities Dealers (NASD). Lewis did not respond to the letter and Merrill Lynch petitioned the court to order Lewis's individual claim to arbitration. We conclude Merrill Lynch has selected NASD as the arbitrator. Answering the petition for arbitration, Lewis asserted: "Plaintiff requests the Court to take Judicial Notice of *Lewis et al v. Prudential Bache Securities Inc.*, San Diego Superior Court #510797, in which Department 35 of this Court on June 21, 1984, by Minute Order, the Honorable Sheridan Reed, Judge presiding, denied a virtually identical Motion to Compel Arbitration under facts and circumstances virtually identical to the instant case. Defendant therein relied upon both the State and Federal arbitration acts."

IV

Prudential Bache Securities, Inc. appealed that denial to this court. On April 8, 1986, we filed our opinion in that case (*Lewis v. Prudential Bache Securities, Inc.* (1986) 179 Cal.App.3d 935 [225 Cal.Rptr. 69]) reversing the order denying arbitration, directing the court to appoint the American Arbitration Association to arbitrate the matter and to determine whether the class may be certified and to retain jurisdiction to safeguard interests of absent class members. Issues in *Prudential* track some of those presented here.

A.

Merrill Lynch contends the state law issues framed in Lewis's complaint are subject to arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1-14) and California limitations on enforceability of arbitrable contracts deemed adhesive are inapplicable. We agree, referring and adhering to *Prudential* in which we discussed and disposed of those issues.

## B.

██ In *Prudential* (179 Cal.App.3d 935 at p. 942, fn. 1), we noted claims arising under the Securities Act of 1933 and the Securities Exchange Act of 1934 are not arbitrable (*Wilko* v. *Swan* (1953) 346 U.S. 427 [98 L.Ed. 168, 74 S.Ct. 182]) and the federal district courts have exclusive jurisdiction over violations of those acts and the rules and regulations promulgated by the Securities and Exchange Commission (SEC) (15 U.S.C. § 78aa). Lewis's claims here, as in *Prudential*, do not arise under the federal securities acts and are not exclusively within the federal jurisdiction.

Effective December 28, 1983, prior to the date Lewis filed his complaint, the SEC promulgated rule 15c2-2 (17 C.F.R. § 240.15c2-2; 48 Fed.Reg. 53404-53407 (1983)), declaring it a fraudulent, manipulative act or practice for a broker-dealer to enter into an agreement with a public customer purporting to bind the customer to the arbitration of future disputes between them arising under the federal securities laws. While this rule became effective after the filing date of the complaint in *Prudential*, it is consistent as far as public customers are concerned with the holding in *Wilko* and we conclude it has no application here as Lewis's causes of action do not arise under the federal securities laws.

## C.

The trial court denied arbitration on the grounds the arbitration of Lewis's claimed violations by Merrill Lynch of an industry-wide practice of using a 360-day year for interest calculations before a panel including securities dealers selected under NASD rules would be unconscionable.

The customer agreement in *Prudential* gave the customer a choice of arbitration forums, NYSE or the American Arbitration Association. As Lewis in *Prudential* failed to elect, Prudential Bache selected NYSE. We reviewed recent California cases dealing with arbitration forum questions and voidability of arbitration provisions where the selected forum is claimed to be institutionally biased. We held the record in *Prudential* established such bias in NYSE and we designated the American Arbitration Association as the arbitration forum. Here, the customer agreements offer a choice between NYSE and NASD. As Lewis declined to elect either forum, Merrill Lynch chose NASD. Nothing in the record on this appeal suggests the analysis made and conclusion reached in *Prudential* is inapplicable as to NYSE's institutional bias. As a conceded impartial forum such as the American Arbitration Association is not available here, we are required to examine Lewis's contention the arbitration provision is unenforceable because NASD is likewise institutionally biased.

## V

NASD adopted a Code of Arbitration Procedure (the code) applicable to NASD arbitrations at times relevant here. The code provided for appointment by NASD's board of governors of a national arbitration committee with authority to establish rules, regulations and procedures for the conduct of arbitration matters. The board appoints a director of arbitration responsible for administration functions involved in arbitration. The director composes and appoints panels of arbitrators from an existing pool[1] to conduct arbitrations. All arbitrations of disputes between NASD members or persons associated with members consist of not less than three nor more than five arbitrators, all of whom are from the securities industry.

Controversies between a customer and a member are arbitrated under the code. The director, with appropriate committee approval, has the right to decline arbitration where the controversy, with due regard to the purposes of NASD and the code's intent, is not a proper subject matter for arbitration. Controversies involving less than $2,500 may be decided by a single arbitrator knowledgeable about the securities industry. Controversies involving less than $100,000 are heard by an arbitration panel of no less than three nor more than five members, at least a majority of whom shall not be from the securities industry unless the customer requests an industry majority. Controversies where the amount is more than $100,000 are heard by a five-member panel at least a majority of whom are not from the securities industry unless the customer requests an industry majority.

The individuals who serve on a panel are determined by the director who may name the chairman. Each party has one peremptory challenge. The director may disqualify a member who discloses information suggesting such person might be precluded from rendering an objective or impartial determination.

The code requires a statement of claim and answer to the claim and allows counterclaims and third party claims. The code provides for a hearing, for counsel, subpoenas, transcript of the hearing if requested and other familiar due process paraphernalia.

---

[1]The pool includes two groups, those who are not from the securities industries (public arbitrators) and those associated with the industry (industry members). The public arbitrators include attorneys, accountants, corporate executives, academicians, investment advisers, real estate agents and people retired from various businesses. They have a working knowledge of the securities industry, some are investors who are customers of broker-dealers, and the attorneys may have represented customers in actions against member firms. At oral argument, counsel for Merrill Lynch stated he could be in such a pool and serve as an arbitrator. The industry members include persons associated with broker-dealers, affiliated with large "wire houses" as well as with introducing firms which clear their business through other broker-dealers.

These arbitration rules and procedures set out in the NASD Code are essentially identical to the NYSE Code we addressed in *Prudential* and of which we take judicial notice (see *Parr* v. *Superior Court* (1983) 139 Cal.App.3d 440, 446 [188 Cal.Rptr. 801]). Our analysis of the NYSE Code applies to the NASD Code before us on this appeal. ■ However, while NYSE and NASD arbitration rules and procedures are twinned, Merrill Lynch contends the 360-day rule is not an industry-wide practice in that area of securities transactions engaged in by NASD members. In *Prudential,* we found all "known" members of NYSE used the 360-day year. Here, Merrill Lynch argues the evidence does not disclose an NASD industry-wide practice in use of the 360-day year; accordingly, the NASD arbitration panel selected under NASD rules will include persons not using or not connected with entities using the 360-day year basis for interest calculations; such a panel is not suspect for fairness, and the institutional bias with resulting unconscionability we found in *Prudential* is missing here.

The record does not support Merrill Lynch's contention. Lewis's complaint does not plead the 360-day year basis for interest calculation is an industry-wide practice. The complaint is directed solely at its usage by Merrill Lynch. In its verified answer, Merrill Lynch pleads a seventh affirmative defense to the first count of the complaint which charges the practice as to margin accounts: "For innumerable years there has existed and still exists throughout the United States a custom and usage in the securities industry which is certain, consistent and reasonable in business and commercial transactions, that interest on margin accounts, such as Plaintiff's margin account with Merrill Lynch herein, be computed on the basis of a commercial year consisting of 360 days. Said custom and usage is well-known and well-established both in California and throughout the United States, and is approved and regulated by the Federal Reserve Board. Pursuant to said custom and usage, the interest on plaintiff's margin account herein was computed on the basis of a commercial year consisting of 360 days, and said custom and usage relating to a commercial year consisting of 360 days became and is a part of the contract between Plaintiff and Merrill Lynch. Similarly said custom and usage relating to a commercial year consisting of 360 days became and is a part of all similar contracts between Merrill Lynch and all putative class members." An identical affirmative defense is pleaded as to the second count concerning interest computed on bonds. Merrill Lynch's assertion the 360-day year is an industry-wide practice may be taken as true. (*Pinewood Investors* v. *City of Oxnard* (1982) 133 Cal.App.3d 1030, 1035 [184 Cal.Rptr. 417].)

The trial court heard and received evidence of NASD broker-dealer activities. A 1981 annual report published by the SEC states almost 2,500 NASD and exchange members conducted a public business as broker or

dealer. One thousand sixty of these dealers operate as clearing or carrying firms. The remainder operate as introducing firms who use the other firms to handle clearing and carrying functions. The report states:

*"The carrying and clearing firms generally accounted for over 90% of the income and resources of all firms conducting a public business in 1980 and 1981; viz., 93% of pre-tax income, 93% of total revenues, 91% of equity capital, 98% of total assets, 70% of all offices, and 92% of all employees.*

"Twenty-one large carrying and clearing firms which are members of the New York Stock Exchange (NYSE) have been classified as National Full Line Firms, if they operated an extensive network of branch offices, or as Large Investment Banking Houses, if they were primarily engaged in securities underwriting and trading activities. In 1981 the eleven National Full Line Firms and the ten Large Investment Banking Houses accounted for 63% of the pre-tax income and 55% of the equity capital attributable to carrying and clearing firms.

"Most of the remaining income and capital of carrying and clearing firms was distributed among 226 broker-dealers who were members of the NYSE. Although non-NYSE firms accounted for 77% of all carrying and clearing firms, only 8.5% of the pre-tax income and 13.7% of the equity capital were attributable to such firms in 1981." (Italics added.)

The report goes on to describe income sources:

"The profitability of the industry has increased sharply from the levels attained in 1977 and 1978 due to the increase in short-term interest rates and the growth of broker-dealers' interest-earning assets. The industry as a whole benefited from these developments by financing a substantial portion of such assets with non-interest-bearing liabilities and by enjoying a small, but favorable interest spread on the increasing volume of transactions in the markets for U.S. Government securities and repurchase agreements.

*"It is estimated that net interest income amounted to almost 60% of pre-tax income in 1980* and *about 85% in 1981.* This does not mean, however, that these percentages of pre-tax income can be ascribed wholly to interest income. Some non-interest expenses are necessarily incurred in generating interest revenues. Moreover, the financing activities of broker-dealers are an integral part of their securities business. For example, carrying firms may use idle funds left in a customer's security account (*i.e.,* free credit balances) to finance margin loans to another customer. *Nevertheless, the dependency of the industry on interest income is a key to understanding its profitability and structure."* (Italics added, except for *i.e.,* italicized in the original.)

With respect to interest on margin accounts, the report notes: "Broker-dealers obtained a total of $2.9 billion in margin interest in 1981. This represents an increase over 1980 in both dollars earned (36% increase) and as a percentage of total revenues (12% in 1980 versus 14% in 1981). The expansion of margin debt along with the continued rise of interest rates contributed to the growth of interest earned on customer margin accounts." While unconsolidated revenues of national full line firms, large investment houses, New York firms, and NYSE regional firms disclose interest revenue from margin accounts, such margin account interest revenue does not appear on the unconsolidated reports of NYSE introducing firms or non-NYSE introducing firms.

However, it is apparent from the report the small number of carrying firms earn more than 90 percent of interest derived from margin accounts. Those accounts, however, include those carried on behalf of the larger number of introducing firms.

The record is persuasive the 360-day rule as to NASD members is used industry-wide and affects industry-wide practice. NASD in the application of the 360-day rule is thus functionally equivalent in this respect to NYSE.

Consistent with our conclusion in *Prudential,* we conclude the NASD Code and the arbitration procedures prescribed under it do not meet the level of integrity requisite to withstand Lewis's claim of unconscionability and he may not be compelled to submit his claim to that NASD arbitration forum.[2] That portion of the customer agreement calling for either NYSE or NASD arbitration is invalid and unenforceable and the order denying arbitration is affirmed.

## VI

Unlike *Prudential,* the agreement here does not enable us to designate another arbitrator as both NYSE and NASD, the alternatives provided for in the agreement, do not afford an impartial and fair forum.

---

[2]Merrill Lynch in its petition for rehearing cites *Hope* v. *Dean Witter Reynolds Organization, Inc.* (1986) 181 Cal.App.3d 446 [226 Cal.Rptr. 439], filed after oral argument here, to support its contention NASD is a neutral forum for arbitration of customer disputes as it is not reflective of the securities industry. *Hope* required arbitration of disgruntled employee lawsuits against their broker-dealer employer and discussed our holding in *Prudential* industry-wide practices raised doubts about fairness of an NYSE arbitration panel dealing with customer-broker disputes. *Hope* noted we distinguished disputes with industry-wide impact, as here, and those involving a disgruntled employee and an employer brokerage firm. *Hope* held the nature of employee-employer disputes did not invalidate NYSE arbitration. Industry-wide practices were not involved. (*Id.,* at pp. 458-459.) In effect, *Hope* is an affirmation of our conclusions here.

However, our affirmance of the order denying arbitration does not necessarily mean that on a proper showing Merrill Lynch would not be entitled to arbitration before another forum. Strong public policy supports arbitration. While the customer agreement requires arbitration before NYSE or NASD, that forum requirement is severable from the agreement to arbitrate customer controversies. Accordingly, Merrill Lynch may renew its motion for arbitration. If the court concludes the agreement to arbitrate is enforceable and the parties cannot agree on the procedure to appoint an arbitrator, the remedy is to be found in Code of Civil Procedure section 1281.6 (*Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1976) 64 Cal.App.3d 899, 906 [135 Cal.Rptr. 26]).

Order affirmed without prejudice to a renewal by Merrill Lynch of a motion for arbitration or to Lewis's opposition to such motion. Costs on appeal to respondent Lewis.

Wiener, Acting P. J., and Work, J., concurred.

A petition for a rehearing was denied August 8, 1986.