Filed 8/13/15  Peters v. Smith CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| MARTHA JO PETERS, | |
| Plaintiff and Appellant, | E058163 |
| v. | (Super.Ct.No. RIC10022491) |
| KIRK SMITH, | O P I N I O N |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Craig J. Riemer, Judge.

Affirmed.

Martha Jo Peters, in pro. per., for Plaintiff and Appellant.

Lubrani & Brown, Michael D. Lubrani, Leanna M. Hiraoka, and Dana C.

Grinestaff for Defendant and Respondent.

## I.  INTRODUCTION

Plaintiff and appellant Martha Jo Peters is a retired school teacher.  In 2005, she

opened a self-directed brokerage account with Scottrade, Inc. (Scottrade).  She was

allowed to buy stocks in this account on margin, i.e., with money borrowed from Scottrade. She also had an IRA account with Scottrade. During her first year of trading stocks, Peters enjoyed success, and her accounts increased substantially in value. Over the next two years, however, Peters suffered large losses. In an attempt to recoup her losses and meet margin calls, she borrowed against her house and used funds withdrawn from her IRA. Eventually, she lost everything.

In 2009, Peters hired defendant and respondent, attorney Kirk Smith, to represent her in litigation against Scottrade, which she believed bore some responsibility for her losses. Smith filed an arbitration claim on Peters's behalf and, one year later, reached a settlement with Scottrade for $12,000. Although Peters was unhappy with the amount, she agreed to the settlement.

In 2010, Peters sued Smith for legal malpractice. Two years later, Smith moved for summary judgment, which the trial court granted. Peters appealed.

Based on our independent review of the record and for the reasons set forth below, we affirm the judgment.

## II. FACTUAL BACKGROUND

A. *Peters's Relationship With Scottrade*

Scottrade was at all relevant times a member of the National Association of Securities Dealers (NASD) or its successor, the Financial Industry Regulatory Authority (FINRA). In June 2005, Peters opened a brokerage account with Scottrade. In her

2

account application, Peters acknowledged that she had received and read Scottrade's brokerage account agreement, which included the following provisions:

"6. No Advice and No Recommendations. You acknowledge that we do not and will not give investment, legal or tax advice or make securities recommendations. You agree that you are a self-directed investor and all orders entered are unsolicited and based on your own investment decisions or the investment decisions of your duly authorized representative. You agree that neither Scottrade nor any of its employees may be your duly authorized representative and that you will neither solicit nor rely upon Scottrade or any of its employees for any such advice. You understand that you are solely responsible for . . . the suitability of any trade(s), investment strategies and risks associated with each trade, and will not hold Scottrade or any of its employees liable for those investment decisions. You further understand that we do not and will not review the appropriateness or suitability for you of any transactions implemented or investment strategies employed in your Account. You hereby agree to hold Scottrade and its officers, directors, employees, agents and affiliates harmless from any liability, financial or otherwise, or expense (including attorneys' and disbursements), as incurred, as a result of any losses or damages you may suffer with respect to any such decision, instruction, transactions, or strategies employed in your Account by you or your duly authorized representative, or as a result of any breach by you of any of the covenants, representations, acknowledgments or warrants therein. [¶] . . . [¶]

"50. No Recommendation of Day Trading. By providing the means to place trades electronically, we do not promote, recommend or endorse what is commonly referred to as day trading – the practice of purchasing and selling the same security within one day's trading. Day trading involves unique risks as described in NASD Rule 2351 and as set forth in the 'Disclosure of Day Trading Risks' provided in our message center. You agree to read this disclosure and to educate yourself on the risks of day trading prior to engaging in this activity through our facilities."

According to the agreement, controversies between the parties are subject to binding arbitration.

One month after opening her account, Peters and Scottrade entered into a margin agreement that allowed her to borrow money from Scottrade to purchase securities. This agreement included the following: "Margin Loans. We may in our sole and absolute discretion, make loans to you for the purpose of purchasing, carrying, or trading in securities, options or other property ('Margin Loans')[.] Margin Loans will be made in a Margin Account. You agree that you are solely responsible for determining whether margin is appropriate for you in light of your financial resources, objectives, and other relevant circumstances. You understand and agree that Scottrade will not make this determination on your behalf."

At some point, Peters opened a separate IRA account with Scottrade.

Peters bought and sold stocks through her Scottrade accounts from June 2005 through May 2008. In her first year of trading, the value of her accounts increased by

4

$80,000 to $100,000 and, at one point, had a combined value of more than $750,000. Thereafter, her accounts began to lose value.

In January 2007, Peters sent an e-mail to the Securities and Exchange Commission (SEC). In the e-mail, Peters expressed concern about her financial losses, complained of technical problems with Scottrade's Web site, and said she suspected that her account was being hacked because "every stock [she] bought" lost value.

In a response to the SEC regarding Peters's complaints, a Scottrade compliance examiner stated that Scottrade had investigated Peters's claims and found no evidence of unauthorized access. The SEC took no action against Scottrade with respect to Peters's complaint.

Peters continued to trade stocks through her Scottrade account throughout 2007. On four occasions in September, October, and December 2007, Scottrade sent letters to Peters informing her that she had been designated a "pattern day trader" as defined in former NASD rule 2520.[1] The letters further informed Peters that she was required to maintain minimum equity requirements of $25,000, and that she needed to deposit additional equity into her account by a specified date. Peters continued to use her Scottrade account after receiving these letters.

---

[1] Former NASD rule 2520 defined day trading as, generally, "the purchasing and selling or the selling and purchasing of the same security on the same day in a margin account . . . ." (NASD rule 2520(f)(8)(B)(i).) A "pattern day trader" is defined generally as "any customer who executes four or more day trades within five business days." (NASD rule 2520(f)(8)(B)(ii).)

On February 24, 2008, Peters submitted a complaint concerning Scottrade with the Internet Crime Complaint Center (IC3). In the complaint, Peters alleged that, "for some unexplained reason, when the market was still strong, [she] began to experience consistent large losses, for a period of about six months." She stated that she believed "that someone was either hacking [her] account or manipulating the trades and trade records" causing her losses. She further stated: "I feel that Scottrade owes me at least a minimal degree of good faith / duty that has been violated by their silent knowledge but inaction during my ongoing losses. I believe they did not act in good faith to me as a client, despite the fact that I was placing my own trades." The IC3 forwarded the complaint to the California Department of Corporations, which took no action with respect to the complaint.

Peters continued trading stocks in her Scottrade account until April 2008. At that time, her account balance was approximately $8,000.

On April 9, 2008, Peters submitted a second complaint to the SEC. In addition to expressing her suspicion that her account had been hacked, Peters alleged that "Scottrade knew about my losses that were growing worse and worse, but neither said nor did anything to prevent further losses. I realize that I was doing the trading . . . but it seems that Scottrade has at least some minimal responsibility to warn or to remove margin trading privileges when a client is losing such an extraordinary amount." The SEC forwarded the complaint to Scottrade and requested a response.

6

On April 29, 2008, Scottrade served a response to Peters's SEC complaint, which stated: "As a self-directed investor, Ms. Peters was responsible for making her own investment decisions. Scottrade does not monitor customer accounts for losses. Also, Scottrade does not suggest that customers remove margin trading from their accounts based on losses incurred nor can Scottrade agree to share in losses with customers." Scottrade further stated that it found nothing to suggest that any third parties were misusing her accounts.

B. *Smith's Representation of Peters*

In September 2008, Peters contacted Smith about representing her in litigation against Scottrade. Smith believed that Peters did not have a strong case against Scottrade and did not want to take her case. However, he eventually agreed to represent her. Smith told Peters that she might be able to settle with Scottrade for $20,000.

On October 19, 2008, Peters sent Smith an e-mail. She explained that her Scottrade accounts were once valued at approximately $754,000. After October 14, 2007, she "began to rack up devastating losses and . . . went into panic mode." She continued trading as her "only hope to recover the losses." She withdrew funds from her retirement account and obtained additional funds by refinancing her house, but "those funds were soon lost as well." She said she suspected "some sort of hacking or fraud," and complained that Scottrade never said anything to her "about removing [her] margin trading abilities nor about the risks of the rather poor strategies [she] was using." She further told Smith: "I feel a strong belief that you will be able to plead my case and get a

7

decent recovery. Ten percent of about $800,000 would be just $80,000. My view is that if I could recover just 20% of what I lost I could using wiser growth strategies rebuild and face a much more secure old age. . . . There is no doubt in my mind at all that you will succeed in getting me some level of recovery and actually I believe probably more than the $20,000 cost of litigation amount you mentioned. Nevertheless that would be very much appreciated if that is to be the outcome."

Peters and Smith signed a retainer agreement that provided for a contingency fee of 40 percent of all sums Peters recovered. The agreement included the following provision: "8. Negotiation and Settlement. The Firm is authorized to negotiate on Client's behalf regarding this matter but may not enter into settlement without Client's approval, which may be given orally. The firm may rely upon the oral representation of Client to settle Client's case, and Client agrees to be bound by such representation and to execute such documents as necessary to memorialize the terms of the settlement. In the event that Client breaches Client's agreement to settle Client's case, Client agrees to immediately pay to the Firm all contingent fees that would be due pursuant to the negotiated settlement, and to immediately pay all expenses of the case incurred by the Firm, and to release the Firm from all further obligation to represent Client under this Agreement. Client agrees that it shall not contact any other party to this matter nor negotiate, obtain, or attempt to obtain, any settlement without the Firm's consent. (CLIENT AGREES TO ACCEPT ANY/ALL SETTLEMENT OFFERS.)" Following

this provision, Peters interlineated the following: "Attorney has client trust that he will make every effort to secure best recovery possible."

On November 13, 2008, Smith filed a statement of claim on Peters's behalf with FINRA. Smith asserted claims under a variety of theories, including breach of contract and warranties, violation of California securities laws and the California Consumer Legal Remedies Act, intentional and negligent misrepresentations, and breach of fiduciary duty. Smith summarized Peters's claims as follows: "This is a case about an unsophisticated investor and retired widow who was permitted and encouraged by the Respondents to day-trade her account into oblivion. The amount of activity permitted by the Respondents is shocking. For instance, in April of 2007 the account balance was only about $25,000, yet the Respondents permitted more than $3.5 million in purchases – earning large amounts of commissions and fees for Respondents. Through it all, the Respondents wholly failed in their regulatory and supervisory responsibilities. Ms. Peters even mortgaged her account and liquidated her IRA to fuel the trading accounts margin requirements. Ms. Peters, having lost everything, is now homeless and destitute, and unable, at age 62, to find employment in her field as a teacher. As a result of the acts and omissions of the Respondent, Claimant sustained losses which approach $500,000, exclusive of interest, costs and attorneys' fees." Smith requested damages in an amount between $100,000 and $500,000, plus "[s]tatutory damages," and punitive damages. Peters told Smith she thought the pleading was "worded so beautifully."

In February 2009, Scottrade responded to the arbitration claim by serving a motion for a more definite statement or, in the alternative, its answer and affirmative defenses. Scottrade asserted that Peters was, in essence, "attempting to shift responsibility for her own trading decisions onto Scottrade, a discount brokerage that offers absolutely no investment advice to its customers." It further stated that any claim by Peters that Scottrade engaged in "churning" is deficient because Peters had a self-directed account and a churning claim required Peters to show that trading in her account was controlled by Scottrade.[2]

The papers supporting Smith's motion for summary judgment include numerous e-mails between Smith and Peters from July 2009 through December 2009. The primary subject of the correspondence is settlement of Peters's claims against Scottrade. For our purposes, the e-mails can be fairly summarized as an effort by Smith to keep Peters's expectations regarding the settlement value of her case to $20,000 or less, and Peters's effort to encourage Smith to obtain a settlement in an amount significantly higher than that. In early December 2009, Smith informed Peters that it "[l]ooks like $10k is the number," but said he would "push for a little more," and would also waive his own fees. When Peters asked Smith to, "at the very least double that with the same reduced fee offer?," Smith said, "I may be able to get 12k. That's it. Final. (period.)" E-mails sent

---

[2] Other than the FINRA claim and Scottrade's response, our record does not include any papers filed or served in the arbitration proceeding; nor does it indicate what, if any, further activity took place in the proceeding.

in mid-December reflect a deteriorating attorney-client relationship, with each side expressing frustration with the other.

Eventually, Peters executed a settlement agreement with Scottrade that provided her with $12,000, and included her general release and waiver of Civil Code section 1542 in favor of Scottrade. In December 2009 or January 2010, Peters received $12,000 from Scottrade.

C. *The Legal Malpractice Lawsuit and Motion for Summary Judgment*

In November 2010, Peters commenced the action below by filing a complaint against Smith for legal malpractice. In the complaint, Peters alleges that she lost over $750,000, including retirement funds, as a result of conduct by Scottrade; Smith agreed to represent her in an action against Scottrade; Smith prepared a pleading in which he sought to recover from Scottrade between $100,000 and $500,000, including punitive damages; Smith told Peters she would be fortunate to recover $20,000 and falsely asserted that Peters agreed to accept a settlement for that amount; Smith "made no effort to ask . . . for an amount that would have allowed [Peters] to recover"; and Smith eventually accepted a settlement of $12,000 without consulting with Peters. She further alleges that Smith "seemed to be acting more on Scottrade's behalf than on [her] behalf, and to be pursuing his own interests . . . ."

In November 2012, Smith filed a motion for summary judgment. Smith asserted that he was entitled to summary judgment on alternative grounds: (1) he did not violate any standard of care owed to Peters, (2) Peters was not injured by any act or omission on

11

the part of Smith, and (3) Peters could not demonstrate causation or damages because she would not have been successful in the underlying case against Scottrade. The motion was supported by declarations from Smith and Steve Buchwalter, among other evidence.

Smith, in his declaration, stated that after he filed the FINRA claim he learned additional facts that "further substantiated [his] initial opinion that Ms. Peters did not have a strong case and that if she arbitrated her case she would likely lose . . . ." First, he received Peters's brokerage account statement, which included the provision that Scottrade did not provide customers with advice on trading and would not review customer's accounts to assess the suitability of trades. Second, he received copies of the complaints Peters made to the SEC, in which she admitted making all of the trades in her account. Third, Scottrade had learned that Peters maintained an Internet blog in which she referred to herself as a "Stock Market Margin Day Trader." This blog, he believed, could be used to show that Peters was more sophisticated than the sympathetic portrayal he had fostered of Peters "as a widow, with little knowledge or experience in trading on the stock market, who got in over her head and lost everything as a result of her trading with Scottrade."

Smith further stated that Peters never provided him with any evidence to prove that her Scottrade account had been hacked. He explained to Peters that he would not be asserting her hacking claim to the arbitrators because "it was too farfetched."

Scottrade initially offered $10,000 to settle Peters's claims. Smith said he was able to increase the amount to $12,000, and was informed by Scottrade's attorneys that

12

this was their final offer. Smith told Peters he would waive his 40 percent contingency fee, but not his expenses, thereby putting her in the same position as if the case had settled for $20,000. Smith subsequently agreed to waive his costs as well.

Buchwalter is an attorney and was previously a licensed stockbroker and commodity trading advisor. He has testified before a United States Senate subcommittee regarding stockbroker practices with respect to the subcommittee's investigation of securities day trading. He has conducted several presentations on securities law at regional and national conferences, and sits on the amicus committee at the Public Investors Arbitration Bar Association.

Buchwalter reviewed Peters's Scottrade account statements and other documents pertinent to her claims against Scottrade and Smith, including her discovery responses and the e-mails Smith and Peters exchanged. He stated that Peters "traded very heavily" throughout 2005 and 2006, including conducting $42 million in transactions in December 2005, and $88 million in transactions in January 2006. By March 2006, Peters was day trading,[3] sometimes making hundreds of trades in a single day. By the end of 2008, Peters had bought and sold approximately $180 million in securities, resulting in a net loss of approximately $261,000. She continued trading heavily in 2007. When she stopped trading in April 2008, her account had a balance of $80.[4]

---

[3] "Day trading," Buchwalter stated, "is when a particular stock is bought and sold within the same calendar day."

[4] Peters disputes the $80 figure, stating that she had $8,000 in her account when she stopped trading, then withdrew all but $80 on Smith's advice.

Buchwalter opined that in representing Peters, Smith never deviated from the applicable standard of care, and that the $12,000 settlement reached with Scottrade was reasonable. The settlement amount was reasonable, he explained, because Peters "would not have been successful if she had arbitrated her case against Scottrade because she was a self-directed investor and Scottrade informed [her] from the outset that Scottrade would not make any recommendations regarding how [she] handled her account or her trading strategy. Furthermore, there was never any evidence to support her claim that her account had been hacked or accessed by a third party." There was, Buchwalter believed, "a 99% chance she would have lost, and received nothing. Furthermore, Scottrade had a better chance of being awarded [its] costs and attorneys fees from Ms. Peters than Ms. Peters had of being awarded a recovery from Scottrade."

Buchwalter stated that Scottrade did not have a duty to determine the suitability of Peters's transactions because it did not give advice or make recommendations regarding stocks; "Scottrade merely provided its clients with access to the stock market . . . ." Buchwalter added: "Since Scottrade did not owe Ms. Peters any duties, it would have been next to impossible to demonstrate to an arbitrator why Scottrade should be held responsible for Ms. Peters' financial losses." Indeed, he points out that if Scottrade prevented Peters from trading, Peters might have sued Scottrade for breach of their agreement by denying her access to her account and the opportunity to recoup her losses.

Peters filed opposition papers, including her declaration. Peters states: Smith did not send to her a refund from FINRA as promised; Smith's claim that the FINRA

arbitrators would have awarded her little or nothing is "ridiculous" because FINRA has awarded substantial sums to retirees like herself who have lost their life savings in risky accounts; Smith "made no efforts at any time during the representation to attain for [her] any damages approximating the amounts stated in the pleading copy he sent her"; she told Smith repeatedly that "she needed a larger recovery appropriate to and in proportion to the loss she suffered"; in November and December 2009, Smith cut off communication with her and "persisted in coercing [her] to accept a meager settlement she did not want"; and she agreed to the settlement "in despair and under duress."

Smith filed reply papers, including written objections to Peters's declaration and many of her responses to the separate statement.

Following a hearing, the court granted the motion for summary judgment. In the written order granting the motion, the court stated: "Given the facts of the underlying case, it was likely that Ms. Peters would not have recovered anything if she had arbitrated her claims against Scottrade, therefore it was reasonable and within the standard of care for . . . Smith to recommend that Ms. Peters settle her case for $12,000. Furthermore, [Peters] cannot prove the element of causation because she cannot demonstrate that she would have been successful in the underlying case against Scottrade because she was a self-directed trader, Scottrade owed her no duty to prevent her from trading, and there was no evidence that any of Ms. Peters' financial losses stemmed from unauthorized third party access to her account." "Lastly, Ms. Peters cannot prove that she was damaged by any action taken by [Smith] because she cannot demonstrate that she would have

15

received a higher settlement or that she would have been awarded more th[a]n $12,000 if her case had been arbitrated."

### III.  DISCUSSION

A. *Requests for Judicial Notice*

Both sides have requested that we take judicial notice of certain matters.  Smith requests that we take judicial notice of (1) former NASD rule 2310; (2) NASD Notice to Members 01-23 (Mar. 19, 2001) (see 2001 WL 278614); (3) New York Stock Exchange (NYSE) rule 405 (see 1995 WL 17845826); and (4) FINRA rule 2090, effective July 9, 2012.  Smith has provided copies of each matter.  We grant the request as to items (1), (2), and (3).  (See Evid. Code, §§ 452, subd. (h), 459, subd. (a); *Parr v. Superior Court* (1983) 139 Cal.App.3d 440, 446 [taking judicial notice of NASD and NYSE rules].)  We decline to take judicial notice of item (4) because it was not in effect during the period of time Peters had her Scottrade account and Smith does not explain why it is relevant.  (See *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 [court may decline to take judicial notice of matters not relevant to issues on appeal].)

In a response to Smith's request for judicial notice, Peters requested judicial notice of six matters.  Each appears to consist of someone's excerpts or summaries of articles or other matter obtained from Internet Web sites.  Copies of the articles are not provided.  The matter does not appear to come within any of the categories of judicially noticeable matter set forth in Evidence Code sections 451 or 452.  We therefore decline to take judicial notice of such matters.

16

In a separate document, Peters requested that we take judicial notice of four other matters: (1) FINRA Notice to Members 07-43 (Sept. 2007); (2) documents from the Internal Revenue Service and the California Franchise Tax Board to Peters indicating that she owes overdue taxes; (3) an investment profile questionnaire from PFS Investment, Inc.; and (4) a United States Department of the Treasury and Internal Revenue Service identity theft affidavit signed by Peters. Smith objects to Peters's request as to items (2), (3), and (4).

We will grant Peters's request for judicial notice of item (1). (See Evid. Code, §§ 452, subd. (h), 459, subd. (a); *Parr v. Superior Court*, *supra*, 139 Cal.App.3d at p. 446.) We decline to take judicial notice of the remaining items because they do not come within any category of judicially noticeable matter under Evidence Code sections 451 or 452.

B. *Summary Judgment Standards*

Summary judgment is properly granted when all of the papers submitted on the motion show there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant is entitled to summary judgment if it establishes a complete defense to each of the plaintiff's causes of action or shows that one or more elements of each cause of action cannot be established. (*Id.*, subd. (*o*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).)

A moving defendant bears an initial burden of making a prima facie showing that there are no triable issues of material fact. If the defendant meets this burden, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850-851.) From commencement to conclusion, however, the moving party defendant generally bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law. (*Aguilar*, *supra*, at p. 850.)

On appeal from the grant of a motion for summary judgment, we independently determine whether there are any triable issues of material fact and the moving party is entitled to judgment as a matter of law. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We consider all of the evidence set forth in the moving and opposition papers, together with inferences reasonably deducible from the evidence, and we view the evidence in the light most favorable to the party opposing the motion. (*Aguilar*, *supra*, 25 Cal.4th at p. 843; *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530.)

C. *Background Principles: Legal Malpractice*

"In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence. [Citations.]" (*Coscia v. McKenna &*

18

*Cuneo* (2001) 25 Cal.4th 1194, 1199-1200.)  Failure to prove any element is fatal to recovery.  (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1581 (*Namikas*).)

"Concerning the third and fourth of these elements, our Supreme Court cautioned: 'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort.  [Citation.]  The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence.'  [Citations.]"  (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 165 (*Filbin*), citing *Budd v. Nixen* (1971) 6 Cal.3d 195, 200.)

To establish causation and damages in a "settle and sue" legal malpractice action such as this, the plaintiff must establish that she would have obtained a more favorable judgment or settlement in the underlying action in the absence of the attorney's negligence.  (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241; *Filbin v. Fitzgerald*, *supra*, 211 Cal.App.4th at p. 166.)  It is not enough for the plaintiff to claim "that it was possible to obtain a better settlement or a better result at trial.  The mere probability that a certain event would have happened will not furnish the foundation for malpractice damages. "'Damages to be subject to a proper award must be such as follows the act complained of as a *legal certainty*."'  [Citations.]"  (*Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461-1462.)  "In other words, the plaintiff must show that '[he] would *certainly* have received more money . . . in settlement or at trial.'  [Citations.]"  (*Namikas*, *supra*, 225 Cal.App.4th at p. 1582.)

As one court recently explained, "'[t]he requirement that a plaintiff need prove damages to "a legal certainty" is difficult to meet in any case. It is particularly so in "settle and sue" cases . . . ,' which are inherently speculative. [Citation.] '[T]he amount of a compromise is often "an educated guess of the amount that can be recovered at trial and what the opponent was willing to pay or accept. Even skillful and experienced negotiators do not know whether they received the maximum settlement or paid out the minimum acceptable. Thus, the goal of a lawyer is to achieve a 'reasonable' settlement, a concept that involves a wide spectrum of considerations and broad discretion. . . .""" (*Namikas*, *supra*, 225 Cal.App.4th at pp. 1582-1583.)

Proving a more favorable outcome in legal malpractice cases requires a "trial-within-a-trial" of the underlying case. (See, e.g., *Namikas*, *supra*, 225 Cal.App.4th at p. 1582; *Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 934; *Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 665.) In determining the outcome of the trial-within-a-trial, the standard is "an *objective* one. The trier of facts determines what *should* have been, not what the result *would* have been, or could have been, or might have been, had the matter been before a *particular judge* or jury." (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 840.)

Although causation is ordinarily a question of fact, the issue "may be decided as a question of law if the undisputed facts permit only one reasonable conclusion." (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1528.)

20

D. *Analysis*

In this case, the "trial-within-a-trial" is Peters's FINRA arbitration proceeding against Scottrade. Although a variety of legal theories were asserted against Scottrade, an issue central to each of her claims is the nature and scope of Scottrade's duty to Peters. In this appeal, Peters contends, in essence, that online brokers such as Scottrade have a duty to "monitor their 'unsophisticated clients' online trades to ensure that each trade is suitable for the investor." For the source of this duty, Peters relies on so-called "suitability" and "know-your-customer" rules applicable to members of securities exchanges—in particular, NASD former rule 2310(a)[5] and NYSE rule 405.

NASD former rule 2310(a) provided: "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs." To ensure that a member has relevant information to determine whether a recommendation is suitable, the "know-your-customer" rule requires NYSE members to "[u]se due diligence to learn the essential facts" regarding their customers, orders, and accounts.[6] (NYSE rule 405; see Gedicks, *Suitability Claims and*

---

[5] NASD rule 2310 was superseded by FINRA rule 2111, effective July 9, 2012. (FINRA Notice 11-25 (May 18, 2011) 2011 WL 2006978.)

[6] NYSE rule 405 also requires members to "[s]upervise diligently all accounts handled by registered representatives of the organization" and "[s]pecifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer . . . ." The person who approves of opening the account

*[footnote continued on next page]*

21

*Purchases of Unrecommended Securities:  An Agency Theory of Broker-Dealer Liability* (2005) 37 Ariz. State Law Journal 535, 541 (*Gedicks*); Jason N. Slezak (N.Y.S.E. Hearing Bd., Dec. 14, 2007, Dec. 07-156, 07-157, 07-158) 2007 WL 4749096, at p. *12 (*Slezak*).)

Initially, we note that courts have generally held that the NASD and NYSE suitability and know-your-customer rules do not create a private right of action in favor of investors.  (See, e.g., *Jablon v. Dean Witter & Co.* (9th Cir. 1980) 614 F.2d 677, 681 [NASD suitability rule]; *Carrott v. Shearson Hayden Stone, Inc.* (9th Cir. 1984) 724 F.2d 821, 823 [NYSE rule 405]; *Thompson v. Smith Barney, Harris Upham & Co.* (11th Cir. 1983) 709 F.2d 1413, 1419 [NYSE's know-your-customer rule and NASD's suitability rule]; see also *Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26, 40, fn. 8 [violation of NASD and stock exchange reporting and disclosure requirements do not support a private cause of action].)  Allegations of unsuitability by customers against their brokers are thus generally addressed in nonjudicial arbitrations.  (See 7 Bromberg & Lowenfels on Securities Fraud (2d ed. 2014) § 13:196 ["the principal forum where private actions for damages based upon violations of the suitability doctrine have been initiated and resolved has shifted from the courts to the arbitration tribunals of the NASD, NYSE, and American Arbitration

---

[footnote continued from previous page]
"shall, prior to giving his approval, be personally informed as to the essential facts relative to the customer and to the nature of the proposed account . . . ."

22

Association"].)  Consequently, there are few published judicial opinions interpreting or applying these rules.  Indeed, neither Peters nor Smith refer us to any.

According to the terms of the NASD suitability rule, when an NASD member *recommends* a transaction to a customer, the member must have reasonable grounds for believing the *recommendation* is suitable for the customer.  (NASD rule 2310(a).)  The rule thus applies when the member makes a "recommendation" to the customer.  That the rule applies *only* when the member makes a recommendation is clear from available interpretive sources.  (See, e.g., S.E.C. Release No. 34-27160 (Aug. 22, 1989) 1989 WL 1093447, at p. *21 ["the NASD and other suitability rules have long applied only to 'recommended' transactions"]; *Parsons v. Hornblower & Weeks-Hemphill, Noyes* (M.D.N.C. 1977) 447 F. Supp. 482, 495 (affd. (1978) 571 F.2d 203) [claim that defendant violated NASD suitability rule lacked merit because there was no evidence that broker recommended the subject purchase]; *In re Thomas Warren, III* (Securities and Exchange Com., Feb. 24, 1994) 51 S.E.C. 1015, 1019, fn. 19 [1994 SEC Lexis 508] [in disciplinary proceeding against registered representative of an NASD member, SEC noted suitability claims were unsupported because there was no evidence that the representative recommended the subject transactions]; Gedicks, *supra*, 37 Ariz. State Law Journal at p. 541 & fn. 13 ["There seems to be widespread agreement among courts, regulators, and commentators . . . that a broker-dealer cannot incur liability on suitability grounds unless it first recommends a securities transaction to a customer"].)

23

In 1996, the NASD issued a notice to its members that explained that the suitability rule does not apply "to situations in which a member acts solely as an order-taker for persons who, on their own initiative, effect transactions without a recommendation from the member . . . ." (NASD Not. to Members 96-60 (Sept. 1996) [1996 NASD Lexis 76, at p. *2].) Five years later, "[i]n light of the dramatic increase in the use of the Internet for communication between broker/dealers and their customers," the NASD promulgated additional guidance regarding the suitability rule. (NASD Not. to Members 01-23 (Mar. 19, 2001) [2001 WL 278614, at p. *1].) At that time, the NASD reiterated that a securities broker "who simply effects a trade initiated by a customer without a related 'recommendation' from the [broker] is not required to perform a suitability analysis . . . ." (*Id.* at p. *6, fn. 7.)

Based on the foregoing, in order for Peters to have a meritorious claim against Scottrade based on unsuitability, she would need to show that her imprudent trading decisions were based on Scottrade's recommendations. The evidence negating such a showing is undisputed. Peters's brokerage account agreement unambiguously provides that Scottrade does not make investment or securities recommendations, and that Peters is solely responsible for determining the suitability of her trades and investment strategies. In her margin account agreement, Peters agreed that she is "solely responsible for determining whether margin is appropriate for [her] in light of [her] financial resources, objectives, and other relevant circumstances" and that "Scottrade will not make this determination on [her] behalf." In Peters's complaints to the IC3 and the SEC, Peters

24

admitted that she "was placing [her] own trades" and "doing the trading." Peters has not offered any facts indicating that any of her transactions were based on a recommendation by Scottrade.

Peters refers us to two arbitration rulings, one disciplinary decision by the NASD, and one disciplinary decision by the SEC: *Peterzell v. Charles Schwab & Co., Inc.* (NASD, June 17, 1991, No. 88-02868) 1991 WL 202358 [arbitration], *Desmond v. Ameritrade Inc.* (NASD, Jan. 14, 2000, No. 98-04397) 2000 WL 726360 [arbitration], *In re Stephen Thorlief Rangen* (Securities and Exchange Com., April 8, 1997, Admin. Proc. File No. 3-8994) 64 S.E.C. 628 [1997 WL 163991] [disciplinary ruling] (*Rangen*), and *District Business Conduct Committee for District No. 9 v. Euripides* (National Bus. Conduct Com., July 28, 1997) 1997 WL 1121335 [disciplinary ruling] (*Euripides*).[7] The two arbitration rulings provide no meaningful statements of fact, discussion of the law, or the arbitrators' reasons for their decisions. Significantly, the rulings do not indicate whether the transactions that led to the investor's losses were related to any recommendation by the broker. The arbitration rulings, therefore, provide no guidance for us.

The *Rangen* and *Euripides* disciplinary rulings do include factual statements and legal reasoning, but do not support Peters's position. In *Rangen*, several customers of

---

[7] In her opening brief, Peters also refers to a "complaint with the New York Stock Exchange" filed by Kathleen Kourie against Charles Schwab & Co., in which Kourie purportedly alleges that Charles Schwab & Co. violated suitability requirements. Peters does not provide a citation for this complaint, and we have been unable to locate any decision of any kind involving these parties.

25

Stephen Rangen, a registered representative with Shearson Lehman Brothers, Inc., made numerous transactions based on Rangen's specific recommendations. Although the customers each sought "safe, income-producing investments, and did not wish to speculate," the transactions recommended by Rangen were "unsuitably risky." (*Rangen*, *supra*, 1997 WL 163991, at p. *3.) The New York Stock Exchange imposed certain sanctions against Rangen. In affirming the NYSE's decision, the SEC found that "Rangen's recommendations to these customers were unsuitable." (*Ibid*.)

In *Euripides*, the appellant, Michael Euripides was a registered securities representative. (*Euripides*, *supra*, 1997 WL 1121335, at p. *1.) He spoke with a customer by telephone, then visited him at his home. At that meeting, the customer agreed to redeem certificates of deposit in a retirement account and purchase certain corporate bonds. Euripides later sold the bonds and purchased stock in another corporation without the customer's authorization. When the investments lost more than three-quarters of their original value, the customer filed a complaint with the NASD. Euripides was fined and suspended because he "lacked reasonable grounds to believe that his recommendations . . . were suitable" and purchased stock without the customer's authorization. (*Id.* at p. *2.) In affirming the ruling, the NASD found that "Euripides recommended that [the customer] purchase two speculative securities" that were "unsuitable for an investor with [the customer's] level of sophistication, income, savings, and investment goals." (*Id.* at p. *4.)

26

Initially, we observe that both *Rangen* and *Euripides* involved disciplinary actions against the securities representatives, not claims for damages by the injured customers. More importantly, in each case, the representatives made specific, unsuitable recommendations to the customer. Indeed, it is clear from the decisions that the determination of unsuitability was dependent upon the fact that the representative recommended the improvident investments to the customer. Here, by contrast, there is no evidence that any of the trades Peters made was based upon a recommendation by anyone affiliated with Scottrade. The disciplinary rulings do not support Peters's position.

Peters also argues that Scottrade's approval of a margin account "was a tacit recommendation which was unsuitable" and that Scottrade had an "ongoing duty to ensure that margin trading was suitable for her." The assertion is contrary to the explicit statement in her margin agreement that she is "solely responsible for determining whether margin is appropriate for" her. Moreover, the NASD has explained that "a transaction will be considered to be recommended when the member or its associated person brings a *specific security* to the attention of the customer . . . ." (NASD Not. to Members 96-60, *supra*, 1996 NASD Lexis 76, at p. *4, italics added.) By approving a margin account, Scottrade did not bring a "specific security" to Peters's attention. Peters offers no pertinent legal authority to support her "tacit recommendation" argument, and there is no basis for us to conclude that a panel of FINRA arbitrators would have adopted it.

Peters points out that the "know-your-customer" rule, NYSE rule 405, requires members to use due diligence to learn the "essential facts" about their customer

regardless of whether the member recommends particular transactions. She is correct. (See Lowenfels & Bromberg, *Suitability in Securities Transactions* (1998-1999) 54 Bus. Law. 1557, 1571.) The NYSE's explanatory comments regarding this rule indicate that the rule is concerned with such matters as (1) ascertaining whether a corporate customer has the right under its charter and by-laws to engage in margin transactions; (2) ensuring that a person entering orders on behalf of corporate customers has the authority to do so; (3) for an agency account, identifying the principal and obtaining written evidence of the agent's authority; (4) obtaining counsel's advice with respect to the documents necessary for a trust account; and (5) ascertaining the customer's country of citizenship.[8] (NYSE rule 405, Supp. Material [1995 WL 17845826].)

To the extent that Peters contends the know-your-customer rule implies or creates a duty on the part of the broker to monitor a self-directed customer's trading for suitability, we reject the contention. To be sure, when a broker makes a recommendation to a customer and, consequently, has a duty to determine the suitability of the recommendation, it would need to ascertain the "essential facts" necessary to determine suitability, such as the customer's age, wealth, investments, financial situation, investment experience and objectives, liquidity needs, and risk tolerance. (See *Slezak*, *supra*, 2007 WL 4749096, at p. *12 ["the Know-Your-Customer Rule ensures that a broker has the necessary information to conduct an appropriate suitability analysis for

---

[8] The only one of these items that pertains to Peters is her citizenry. In her account application, Scottrade asked Peters to state whether she is a United States citizen on her brokerage account, and Peters indicated she was.

28

each transaction"].)  When, however, the member is a mere order taker that makes no recommendations to the customer, such information would not appear to be essential; what is essential in that situation may be no more than what is necessary to take the customer's order and fill it.  Thus, although the know-your-customer rule applies to every customer, account, and trade regardless of whether the broker makes recommendations, it does not follow that, as Peters suggests, every member must learn the kind of information necessary to evaluate the suitability of each transaction and to then determine suitability.  Again, Peters has referred us to no authority that suggests such an interpretation.[9]

Regarding Peters's allegations that her account had been hacked, Peters describes "suspicious freeze-ups of [Scottrade's] web site" and observed that when she would begin typing a stock symbol into the order blank, another stock's symbol would automatically fill the space.  She also indicated that Scottrade brokers told her that her account had been accessed from "plural IP addresses," even though she used only one computer.  Peters also pointed to her "consistent losses," which, while not "conclusive proof of hacking," defied "the laws of probability."

In support of the motion for summary judgment, Smith produced Scottrade's January 2007 and April 2008 responses to Peters's complaints to the SEC regarding

_____

[9] In addition to serving the purpose of requiring broker-dealers to obtain information about their customers in order to evaluate a transaction's suitability, the know-your-customer rule serves the additional purpose of "rooting out fraud or other criminal activity, such as money laundering or the financing of terrorism, by requiring broker-dealers to verify the identity of their customers."  (*Slezak*, *supra*, 2007 WL 4749096, at p. *12.)  There is nothing about this purpose of the rule that supports Peters's claims.

29

hacking. In the responses, Scottrade stated it had found no evidence of unauthorized access or third party misuse of Peters's accounts and that all of Peters's trades are traceable to her. Smith also proffered Buchwalter's declaration in which he states that evidence of Scottrade's Web site freezing up or the use of an automatic fill feature program is not indicative of hacking. Buchwalter also observed that hacking is generally demonstrated by evidence of money being transferred from the client's account to another person's account, yet Peters was not asserting any such activity. In light of her hacking allegations and the evidence, Buchwalter opined that if Peters "had arbitrated her case, she would have been held responsible for all of the trades made from her account and therefore for all of the losses to her Scottrade account."

In Peters's opposing separate statement, Peters explained that her hacking contentions are based upon her "unusual experiences [w]ith the Scottrade online trading website," and conceded: "I have no proof of the hacking, though it seems [v]ery likely . . . ."

Based on the evidence submitted in favor of and in opposition to the motion for summary judgment, we conclude that there is no triable issue of material fact as to whether Peters would have been successful in proving her claim that her losses were caused by someone hacking her Scottrade account.

In light of the nature of Peters's account with Scottrade, the fact that Peters made her own decisions regarding her account without any recommendations from Scottrade, and the absence of any material evidence to support her hacking allegations, no

30

reasonable fact finder could conclude that Peters would have been successful if her claims against Scottrade had proceeded to a hearing. Thus, in light of the lack of merit of her claims against Scottrade, Peters cannot show that she would have received more money from Scottrade, even if Smith breached any standard of care owed to her. (See *Namikas*, *supra*, 225 Cal.App.4th at p. 1582.) She cannot, therefore, establish causation of any damages, an essential element of her legal malpractice claim. Accordingly, the trial court did not err in granting Smith's motion for summary judgment.

## IV. DISPOSITION

The judgment is affirmed. Smith is awarded his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
J.

We concur:

RAMIREZ _____
P. J.

MILLER _____
J.

31