Filed 6/29/26

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JANE DOE 1 et al., | B343201 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 24STCV14962) |
| v. | |
| McGRATH KAVINOKY LLP et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Affirmed.

Venable, David E. Fink, Michael C. Godino and Tatiana A. Nikolaeva for Defendants and Appellants.

Affeld England & Johnson, David W. Affeld and Edward E. Johnson for Plaintiffs and Respondents.

Arbogast Law and David M. Arbogast for Consumer Attorneys of California as Amicus Curiae.

———————————————

# INTRODUCTION

In *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59 (*Sheppard*) the Supreme Court held that, when a lawyer violates an ethical rule by entering into an engagement agreement without disclosing a conflict of interest, the entire agreement, including its arbitration provision, is unenforceable. In this case the trial court, applying *Sheppard*, denied a law firm's motion to compel arbitration on the ground the firm, which represented multiple victims of sexual abuse by the same physician, violated an ethical rule by failing to disclose and obtain informed written consent to the potential conflict arising out of representing multiple plaintiffs against the same defendant. We conclude that, though *Sheppard* involved an actual conflict and this case involves a potential conflict, the rule of *Sheppard* applies. Therefore, the trial court did not err in ruling the law firm's engagement agreement was unenforceable, and we affirm the order denying the motion to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *McGrath Kavinoky LLP Represents Does 1 and 2 in Actions Against Dr. James Heaps and UCLA*

In 2020 Jennifer McGrath and Darren Kavinoky formed McGrath Kavinoky LLP to represent victims of sexual abuse by Dr. James Heaps, a gynecologist at the University of California, Los Angeles. When Jane Doe 1 retained McGrath Kavinoky LLP in January 2020, the law firm represented at least 36 former

2

patients of Dr. Heaps.[1]  Jane Doe 2 retained McGrath Kavinoky LLP in February 2021.  The firm ultimately represented 312 clients in separate cases against Dr. Heaps and UCLA.  The cases were coordinated before a single judge.

In January 2022 McGrath Kavinoky LLP notified Does 1 and 2 that the firm had tentatively reached an aggregate settlement with Dr. Heaps and UCLA.  Does 1 and 2 agreed to the settlement.  The trial court appointed retired judges to oversee the allocation of the $374.4 million settlement.  Doe 1 received $1.4 million, and Doe 2 received $1.7 million, less the firm's contingency fee and costs.

B.  *Does 1 and 2 File This Action Against McGrath, Kavinoky, and McGrath Kavinoky LLP*

In June 2024 Does 1 and 2 filed this action against McGrath, Kavinoky, and McGrath Kavinoky LLP (collectively, McGrath Kavinoky).  Does 1 and 2 alleged that, because they were longtime patients of Dr. Heaps (10 and 20 years, respectively), they were among the victims who experienced the worst of his sexual harassment and abuse.  They alleged that McGrath and Kavinoky told Doe 1 "she would recover a multiple of" another client's $2.25 million settlement and that they told Doe 2 "her case was worth a high seven-figure or eight-figure amount."  Does 1 and 2 alleged McGrath and Kavinoky told them that "they would handle each woman's case individually, to achieve the best possible result for that woman, even if it meant going through lengthy litigation and potentially a trial," and that "they would limit the number of former Heaps patients they

---

[1]  McGrath filed an action on behalf of Doe 1 in August 2019, when McGrath worked for another law firm.

agreed to represent to ensure they could work for the best outcome for each individual." They further alleged McGrath and Kavinoky "bullied them" into agreeing to the settlement and used an improper allocation process. Finally, Does 1 and 2 alleged McGrath and Kavinoky violated ethical rules requiring them to disclose that representing multiple clients created a potential conflict of interest and that negotiating and reaching an aggregate settlement created an actual conflict of interest. Does 1 and 2 asserted causes of action for professional negligence, breach of fiduciary duty, fraudulent misrepresentation, fraudulent concealment, breach of written contract, breach of the implied covenant of good faith and fair dealing, and an accounting.

C. *The Trial Court Denies McGrath Kavinoky's Motion To Compel Arbitration*

McGrath Kavinoky moved to compel arbitration under arbitration provisions in the firm's engagement agreements with Does 1 and 2. Does 1 and 2 opposed the motion, arguing McGrath Kavinoky violated rule 1.7(b) of the Rules of Professional Conduct,[2] which prohibits a lawyer from representing a client where there is a significant risk the lawyer's representation will be materially limited by the lawyer's responsibilities to another client, unless the lawyer obtains informed written consent. Does 1 and 2 argued McGrath Kavinoky's failure to disclose "the risk that conflicts of interest can arise when a law firm represents multiple parties in a single

_____

[2]     Undesignated references to rules are to the Rules of Professional Conduct.

4

proceeding" made the engagement agreements, including the arbitration provisions, unenforceable.

The trial court denied the motion to compel arbitration. The court stated: "It appears to the Court that at the time Plaintiffs entered into their respective retainer agreements, the likelihood of a conflict of interest arising was high. As Plaintiffs point out, Defendants were representing dozens of separate clients who all had claims against Dr. Heaps. Although the cases were filed separately, they were litigated in the aggregate with the aim of obtaining a global settlement. Accordingly, each Plaintiff would be in competition with each other plaintiff as to their allotted settlement amount. Defendants' failure to disclose this conflict, at any time during the representation, invalidates the retainer agreement and the arbitration clause contained therein." McGrath Kavinoky timely appealed.

## DISCUSSION

A.     *Applicable Law and Standard of Review*

"'[I]n ruling on a motion to compel arbitration, the court must first determine whether the parties actually agreed to arbitrate the dispute. [Citations.] General principles of California contract law guide the court in making this determination.'" (*Ford Motor Warranty Cases* (2025) 17 Cal.5th 1122, 1128; see *Enmark v. KF Community Care, LLC* (2024) 105 Cal.App.5th 463, 471 ["'"'[T]he right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties.'"'"].)

"The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing

arbitration bears the burden of proving any defense . . . ." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236; see *Ford Motor Warranty Cases*, *supra*, 17 Cal.5th at p. 1128; *Mar v. Perkins* (2024) 102 Cal.App.5th 201, 211.) "The trial court sits as a trier of fact, weighing the evidence submitted to reach a final determination." (*Wright v. WellQuest Elk Grove, LLC* (2026) 119 Cal.App.5th 267, 274; see *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) "'On appeal from an order denying a petition to compel arbitration, we review the trial court's factual determinations under the substantial evidence standard, and we review the legal issues independently.'" (*Pacific Fertility Cases* (2022) 85 Cal.App.5th 887, 892; see *Quilala v. Securitas Security Services USA, Inc.* (2025) 117 Cal.App.5th 75, 82.)

B. *The Trial Court Did Not Err in Denying McGrath Kavinoky's Motion To Compel Arbitration*

1. *Sheppard*

In *Sheppard* a law firm agreed to represent a manufacturing company in a qui tam action brought on behalf of several public entities against the company.[3] (*Sheppard*, *supra*, 6 Cal.5th at pp. 67-68.) The law firm did not disclose it represented one of those public entities in unrelated employment matters. (*Id.* at pp. 69-70.) When the public entity discovered the dual representation, it successfully moved to disqualify the

---

[3] "A qui tam suit is an action brought under a statute which allows a private person to sue for an award of damages, part of which the government will receive." (*People ex rel. Henggeler v. Dauod* (2026) 117 Cal.App.5th 939, 942.)

6

law firm in the qui tam action.  (*Id.* at p. 70.)  The law firm sued the manufacturing company to collect its outstanding fees and moved to compel arbitration under an arbitration provision in its engagement agreement.  (*Id.* at pp. 70-71.)  The trial court granted the motion to compel arbitration, the arbitrators ruled in the law firm's favor, and the trial court confirmed the award.  (*Id.* at p. 71.)

The Supreme Court reversed, holding "the law firm's conflict of interest rendered the agreement with the manufacturer, including its arbitration clause, unenforceable as against public policy."  (*Sheppard*, *supra*, 6 Cal.5th at p. 68.)  Citing Civil Code section 1667, the Supreme Court stated a "contract is unlawful, and therefore unenforceable, if it is '[c]ontrary to an express provision of law' or '[c]ontrary to the policy of express law, though not expressly prohibited.'"  (*Sheppard*, at p. 73.)  The Supreme Court stated that, because "the rules 'are not only ethical standards to guide the conduct of members of the bar,'" but also "'an expression of public policy to protect the public,'" an "attorney contract that has as its object conduct constituting a violation of the Rules of Professional Conduct is contrary to the public policy of this state and is therefore unenforceable."  (*Id.* at p. 74.)  The Supreme Court explained that, where "'the alleged illegality goes to only a portion of the contract (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable.'"  (*Id.* at p. 77.)  But where "'grounds exist to revoke *the entire contract*, such grounds would also vitiate the arbitration agreement.'"  (*Id.* at p. 76.)

Turning to the engagement agreement between the law firm and the manufacturing company, the Supreme Court

concluded the law firm's concurrent representation of that client and the public entity violated former rule 3-310(C)(3)[4] and rendered the engagement agreement (including its arbitration provision) unenforceable. (*Sheppard*, *supra*, 6 Cal.5th at p. 80.) The Supreme Court rejected the law firm's argument its ethical violation should not invalidate the entire engagement agreement, stating "the object of the agreement was representation in the qui tam action," a "representation that violated rule 3-310(C)(3)." (*Sheppard*, at pp. 86-87.)

        2.     *Rule 1.7(b) and Ethical Issues Relating to Aggregate Settlements*

Rule 1.7(b) states a lawyer may not, without informed written consent, "represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client." Rule 1.8.7(a) requires a lawyer to obtain a client's informed written consent before entering into an aggregate settlement, but does not address a lawyer's ethical duties at the time the client engages the lawyer. No California authority has addressed whether a lawyer violates rule 1.7(b) by representing multiple clients suing the same defendants for similar injuries without obtaining informed written consent at the outset of the engagement. Other authorities, however, have concluded a

---

[4]      Former rule 3-310(C) stated: "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict." Rule 1.7 replaced former rule 3-310 effective November 1, 2018. (*Jarvis v. Jarvis* (2019) 33 Cal.App.5th 113, 135, fn. 7.)

lawyer representing multiple clients against the same defendants should disclose the foreseeable risk a conflict may arise where there may be an aggregate settlement.  For example, a comment to rule 1.8(g) of the American Bar Association's Model Rules of Professional Conduct (Model Rules)[5] states:  "Differences in willingness to make or accept an offer of settlement are among the risks of common representation of multiple clients by a single lawyer.  Under [Model] Rule 1.7, this is one of the risks that should be discussed before undertaking the representation, as part of the process of obtaining the clients' informed consent."[6] (Model Rules, rule 1.8(g), former com. [13], now com. [16]; see ABA Formal Ethics Opns., formal opn. No. 06-438 (Feb. 10, 2006) p. 2 (ABA Ethics Opinion) ["As noted in [former] Comment [13] to Rule 1.8, differences in the willingness of each represented client to make or accept an offer of settlement are among the risks that should be considered when a lawyer undertakes to represent multiple clients in matters where a settlement or plea agreement proposal could create a conflict among them."]; Bar Assn. of San Fran. Formal Opn. 2017-1 (Sept. 2017) p. 7 (BASF Ethics Opinion) ["the engagement agreement must disclose the

---

[5]     California adopted Model Rule 1.8(g) as rule 1.8.7, but did not adopt the comments to Model Rule 1.8(g).

[6]     Though the Model Rules are not binding, "they may be 'helpful and persuasive in situations where the coverage of our Rules is unclear or inadequate.'"  (*Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 52, fn. 12; see *In re Reno* (2012) 55 Cal.4th 428, 466 [the "'ABA Model Rules of Professional Conduct *may* be considered as a collateral source, particularly in areas where there is no direct authority in California and there is no conflict with the public policy of California'"].)

reasonably foreseeable risk that a dispute will arise concerning the joint clients' willingness to accept an aggregate settlement offer"]; Tuft & Mohr, Cal. Practice Guide: Professional Responsibility & Liability (The Rutter Group 2026) ¶ 4:150.5 [same]; see also BASF Ethics Opinion, at p. 7 [because an aggregate settlement must be divided among all plaintiffs, "every dollar distributed to one client means one less dollar for the other client(s)"].)[7]

One commentator states a lawyer representing multiple clients in a tort action against the same defendant should explain, at the outset of the representation, the potential conflicts that may arise where there may be an aggregate settlement: "To help accomplish a fully informed consent to a waiver of conflicts, plaintiffs' lawyers should draft fee agreements and/or initial client correspondence to explain that: The lawyer cannot favor one client over another with respect to settlement[;] the defendant may pursue settlement negotiations separately for each plaintiff or on a pure or 'hybrid' global basis; settlement-related conflicts could arise under either negotiation scenario, including the possibility that any settlement(s) may be conditioned on high participation rates of all plaintiffs; under such conditions, some of the plaintiffs may want to settle while others will not; if so, it may be necessary for the lawyer to withdraw from representing certain (but not all) clients; and some client information . . . may not be kept confidential vis-à-vis

---

[7] "[O]pinions of ethics committees in California, although not binding, should be consulted for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered." (Rule 1.0, com. [4].)

other clients." (Garretson, *A Practical Approach to Proactive Client-Counseling and Avoiding Conflicts of Interest in Aggregate Settlements* (2004) 6 Loyola J. Pub. Int. L. 19, 31, fns. omitted.)

Even where an attorney does not negotiate an aggregate settlement, other types of conflicts among jointly represented clients are foreseeable. As the BASF Ethics Opinion recognizes, a lawyer "should disclose all potential conflicts arising from the aggregate representation and the disadvantages of the joint representation," including conflicts regarding the order in which cases are tried, differences in the severity and provability of each client's damages, and the risk joint representation "may result in less vigorous advocacy or assertion of one particular client's individual or separate interests than if the lawyers were to represent only that particular client." (BASF Ethics Opn., *supra*, at p. 4.)

As another commentator explains: "Conflicts of interest inhere in collective representation. Unless the plaintiffs' interests are perfectly aligned, which is rare, a lawyer representing multiple plaintiffs with related claims inevitably faces decisions about whose interests to advance." (Erichson, *Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-Class Collective Representation* (2003) 2003 U.Chi. Legal F. 519, 558 (Erichson).) Therefore, the commentator concludes: "If plaintiffs' counsel intends to seek to maximize group interests, which presents inherent conflicts of interest, she should get informed consent from the clients at the outset of the collective representation." (*Id.* at p. 577; see Moore, *Ethical Issues in Mass Tort Plaintiffs' Representation: Beyond the Aggregate Settlement Rule* (May 2013) 81 Fordham L.Rev. 3233, 3242 ["for most mass tort representations, a material limitation

11

conflict of interest arises among the many clients of a plaintiffs' attorney—a conflict that must be dealt with at the outset of the representation"]; see also *In re Disciplinary Proceeding Against Marshall* (2007) 160 Wash.2d 317, 336, 337 [under a rule requiring a client's written consent where representation "may be materially limited by the lawyer's responsibilities to another client," a lawyer representing several clients in a workplace discrimination case "had a duty to explain to each client 'the implications of the common representation and the advantages and risks involved' and to get consent in writing from each"].)

For example, conflicts may arise when a lawyer must decide which client's case to try first. "Suppose a client's case is moving toward trial. The client desires a trial as soon as possible, perhaps because she needs prompt compensation, or because she has concerns about the unavailability of key witnesses with the passage of time. Her lawyer, however, knows that the particular client's case is problematic and that the collective interests of the plaintiffs would be better served by delaying that case and speeding another to trial first. Should the plaintiffs' lawyer be permitted to advance aggregate interests by pushing a stronger case to trial before the problematic case?" (Erichson, *supra*, 203 U.Chi. Legal F. at pp. 559-560, fns. omitted.) Conflicts may also arise in making other litigation decisions. "In discovery, for example, a lawyer must decide which information to seek first or most aggressively. May a lawyer focus first on information needed for the many, rather than on information needed for an individual?" (*Id.* at p. 560.)

12

3.   *The Trial Court Did Not Err in Ruling*
     *McGrath Kavinoky Violated Rule 1.7(b) by*
     *Failing To Obtain Informed Written Consent to*
     *Its Multiple Representation*

As stated, the trial court found that, "at the time [Doe 1 and Doe 2] entered into their respective retainer agreements, the likelihood of a conflict of interest arising was high." Substantial evidence supported that finding. McGrath and Kavinoky formed McGrath Kavinoky LLP in 2020 to represent former patients of Dr. Heaps. When Doe 1 signed the engagement agreement in January 2020, McGrath Kavinoky represented at least 36 former patients of Dr. Heaps. Five weeks after Doe 2 signed her engagement agreement in early 2021, McGrath Kavinoky told her it was representing 180 patients. The trial court could reasonably infer two lawyers who formed a law firm specifically to represent Dr. Heaps's former patients in litigation against him and UCLA intended to represent as many of those patients as possible. The trial court could also reasonably infer that, rather than try dozens or even hundreds of cases, McGrath and Kavinoky hoped to resolve all of their clients' cases through an aggregate settlement. Which is exactly what happened. McGrath Kavinoky ultimately represented at least 312 patients, and only 11 months after signing Doe 2, the firm reached an aggregate settlement.

At the outset of the representation, therefore, there was a significant likelihood that McGrath Kavinoky would enter into an aggregate settlement, that some clients might want to settle while others might not, that the defendants' willingness to settle might be conditioned on a certain percentage of McGrath Kavinoky's clients participating in the settlement, and that

13

McGrath Kavinoky's clients would necessarily compete against each other for their share of the settlement.  Thus, there was a significant risk McGrath Kavinoky's representation of Doe 1 and Doe 2 would be materially limited by its responsibilities to its other clients.  McGrath Kavinoky's failure to obtain the informed written consent of Doe 1 and Doe 2 violated rule 1.7(b), which under the Supreme Court's decision in *Sheppard* made McGrath Kavinoky's engagement agreements unenforceable.  (See *Sheppard*, *supra*, 6 Cal.5th at p. 74 [an attorney contract that violates an ethical rule is contrary to public policy and therefore unenforceable]; BASF Ethics Opinion, *supra*, at p. 7 [an "engagement agreement must disclose the reasonably foreseeable risk" clients will disagree on whether to accept an aggregate settlement offer]; Moore, *supra*, 81 Fordham L.Rev. at pp. 3253-3254 ["since it will be extremely difficult for clients to withdraw from the group and obtain individual representation once an aggregate settlement offer is negotiated, it is critical that clients be advised of the material risks of an aggregate settlement well in advance of the negotiation of such a settlement"].)  As the Consumer Attorneys of California states in its amicus brief, "where a lawyer agrees to represent more than one client in the same litigation, there is often, if not always, a very real possibility the interests of the lawyer's multiple clients may conflict with each other."

McGrath Kavinoky argues substantial evidence did not support the trial court's finding that, at the time the parties executed the engagement agreements, it was highly likely a conflict of interest would arise.  McGrath Kavinoky argues that there was no evidence "*any* form of settlement was even contemplated at the time Does 1 and 2 engaged McGrath

14

Kavinoky, much less a global settlement," and that it "was no more than a *possibility* that one day in the future, the separate clients might 'share' in a pool of settlement funds." But as discussed, substantial evidence, including the trial court's reasonable inferences, supported the trial court's finding McGrath Kavinoky intended to seek a global settlement. (See *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 913 ["when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable"]; *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 621 ["'the appellate court will not substitute its deductions for the reasonable inferences actually or presumptively drawn by the trial court'"]; see also *Algo-Heyres v. Oxnard Manor LP* (2023) 88 Cal.App.5th 1064, 1070 [when reviewing an order denying a motion to compel arbitration, we "'"must 'accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision'"'"].)

McGrath Kavinoky also argues the trial court applied the wrong standard under rule 1.7(b). McGrath Kavinoky relies on comment [4] to rule 1.7, which states the "critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of each client." (Fn. omitted.) McGrath Kavinoky argues the trial court completed "only half the inquiry": It contends the court found "there was a 'high likelihood' of a conflict of interest arising," but did not find "such a potential

15

conflict was likely to 'materially limit'" McGrath Kavinoky's representation of Doe 1 and Doe 2.

The trial court correctly applied rule 1.7(b). After quoting rule 1.7(b) and comment [4], the court found a conflict of interest was likely. The court also found that McGrath Kavinoky litigated the cases in the aggregate to obtain a global settlement and that each plaintiff would compete with the other plaintiffs for a share of the settlement. When a lawyer represents multiple clients who will share in a single settlement fund, the lawyer's ability to advocate for the largest possible share for each client is materially limited by the lawyer's obligations to his or her other clients. (See *Bridgepoint Construction Services, Inc. v. Newton* (2018) 26 Cal.App.5th 966, 970 [court properly disqualified an attorney whose three clients were "all seeking the same damages from the same $2 million pool," and even though "the trial court will ultimately decide who recovers the money," the attorney will still have a conflict because the "court's decision will be influenced by the representation each party receives"]; Rule 1.8.7 [a lawyer may not enter into an aggregate settlement without obtaining clients' informed written consent].)

Selectively quoting from the trial court's order, McGrath Kavinoky argues the court erred in invalidating the arbitration agreement "on the ground that [McGrath Kavinoky] failed to disclose the conflict 'at any time during the representation.'" McGrath Kavinoky contends a "potential conflict that arises during a contract's performance cannot be used to retroactively invalidate the contract from its inception." But as discussed, the trial court also found the potential conflict existed at the outset of the representation, which, absent informed written consent, invalidated the engagement agreements.

16

Next, McGrath Kavinoky tries to distinguish *Sheppard* by relying on *Brawerman v. Loeb & Loeb LLP* (2022) 81 Cal.App.5th 1106 (*Brawerman*). In *Brawerman* a law firm's former client appealed from an order confirming an arbitration award, arguing the law firm's retainer agreement containing the arbitration provision was unenforceable because one of the attorneys who performed legal services was not licensed in California. (*Id.* at p. 1111.) The court in *Brawerman* distinguished *Sheppard*, stating: "In *Sheppard*, entry into the engagement agreement *itself* was an ethical violation because [the law firm] represented [the client's] litigation adversary in another matter. [Citation.] Put another way, it was impossible for [the law firm] to enter into the engagement agreement . . . without committing an ethical breach. As a result, the entire object of the engagement agreement was an engagement that [the law firm] was prohibited to take on. [Citation.] [¶] Here, in contrast, there was nothing inherently illegal about the Retainer Agreement, and [the law firm] was capable of performing it legally. The object of the agreement, as found by the trial court, was not [the unlicensed attorney's] representation, but rather '[the law firm's] representation of [the client] in the . . . transaction.'" (*Id.* at p. 1123, fn. omitted.)

McGrath Kavinoky argues *Brawerman*, not *Sheppard*, governs this case because "no conflict existed at the time the parties executed the Engagement Agreements for either Doe 1 or Doe 2" and it "was entirely possible for McGrath Kavinoky to perform the agreements ethically."[8] McGrath Kavinoky's

---

8    Does 1 and 2 argue McGrath Kavinoky forfeited the "argument . . . this case resembles *Brawerman*" by not citing *Brawerman* in the trial court. ""As a general rule, theories not

17

argument ignores the trial court's finding that, at the time the parties executed the engagement agreements, it was highly likely a conflict of interest would arise.  Unlike *Brawerman*, where "the illegality lay not in the entry into the agreement but in its *performance*" by an unlicensed attorney (*Brawerman, supra*, 81 Cal.App.5th at p. 1124), McGrath Kavinoky violated rule 1.7(b) when it entered into the engagement agreements without obtaining the informed written consent of Doe 1 or Doe 2.[9]

McGrath Kavinoky also tries to distinguish *Sheppard* by arguing that in *Sheppard* "there was an actual, existing conflict between adversaries, which the law firm *knew* about but intentionally withheld from the client."  McGrath Kavinoky argues "*Sheppard* did not even address the risk of a future, potential conflict, under Rule 1.7(b) or otherwise."  But rule 1.7

---

raised in the trial court cannot be asserted for the first time on appeal . . . .'"'" (*Saurman v. Peter's Landing Property Owner, LLC* (2024) 103 Cal.App.5th 1148, 1167.)  But there is "no prohibition against citation of new *authority* in support of an *issue* that was in fact raised" in the trial court.  (*Giraldo v. Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 251.) McGrath Kavinoky relies on *Brawerman* to support its position on the same issue both parties raised in the trial court: whether McGrath Kavinoky's engagement agreements were unenforceable under *Sheppard*.

[9]     McGrath Kavinoky argues that, even if it "later" violated an ethical rule by failing to disclose a conflict that arose when its clients accepted the aggregate settlement, that violation would not void the engagement agreements.  Perhaps, but the trial court found McGrath Kavinoky violated rule 1.7(b) when it entered into the engagement agreements, not later.

requires informed written consent for actual conflicts (rule 1.7(a)) and potential conflicts (rule 1.7(b)). (See rule 1.7, com. [4] ["[e]ven where there is no direct adversity, a conflict of interest requiring informed written consent under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited"], fn. omitted.) McGrath Kavinoky does not explain why a violation of rule 1.7(a) renders an engagement agreement unenforceable, but a violation of rule 1.7(b) does not. McGrath Kavinoky argues it would "set a dangerous precedent" to invalidate engagement agreements "because the lawyers failed to foresee conflicts that could possibly arise in the future." Rule 1.7(b), however, does not require lawyers to foresee any conflict that could possibly arise in the future; it only requires lawyers to obtain informed written consent if there is a significant risk the lawyer's representation will be materially limited by the conflict. (See rule 1.7(b).)

Similarly, McGrath Kavinoky argues that, in *Sheppard*, "it was undisputed" former rule 3-310(C) applied because the law firm's clients were directly adverse to one another, but that rule 1.7(b), "in contrast, requires a fact-intensive inquiry to determine whether a significant risk of future material limitation was present at the time of the agreement." McGrath Kavinoky argues the Supreme Court in *Sheppard* did not "hold that such a *post-hoc* inquiry, conducted years after the fact and with the benefit of hindsight, may be used to invalidate an attorney engagement agreement." Trial courts, however, are well-equipped to, and often do, conduct the factual inquiry required to determine whether, at a previous time, there was a significant risk a lawyer's representation would be materially limited by a

19

conflict. (See *Kader v. Southern California Medical Center, Inc.*
(2024) 99 Cal.App.5th 214, 221 [in ruling on a motion to compel
arbitration, ""'the trial court sits as a trier of fact, weighing all
the affidavits, declarations, and other documentary evidence, as
well as oral testimony received at the court's discretion, to reach
a final determination'"'"].) Though in *Sheppard* the Supreme
Court did not consider whether a potential (as opposed to an
actual) conflict invalidated an engagement agreement, the
rationale of the Supreme Court's decision in *Sheppard*—that a
violation of the Rules of Professional Conduct renders an
engagement agreement, including its arbitration clause,
unenforceable—applies equally to violations of rules 1.7(a) and
1.7(b).[10]

McGrath Kavinoky contends the Supreme Court in
*Sheppard* "expressly declined to decide the circumstances in
which an advance waiver of potential future conflicts may be
permissible" because the Supreme Court was dealing with
"'disclosure and waiver of a known *existing* conflict.'" McGrath
Kavinoky omits the context for that quotation from *Sheppard*. In

_____

[10] McGrath Kavinoky also argues *Sheppard* is distinguishable
because former rule 3-310(C), unlike rule 1.7(b), "was a 'checklist'
rule that identified 'discrete categories of current conflict
situations.'" (See rule 1.7 [eff. Nov. 1, 2018], Commission for the
Revision of the Rules of Professional Conduct, Executive
Summary, pp. 4, 2 [while former rule 3-310(C) used a "'checklist
approach,'" rule 1.7 will "increase client protection" by including
"generally-stated conflicts principles . . . rather than limiting the
rule's application to several discrete situations as in current rule
3-310(B) and (C)"].) We do not share McGrath Kavinoky's
concern trial courts will have trouble determining whether a
lawyer violated an ethical rule based on general conflicts
principles, as opposed to a "checklist" rule.

20

*Sheppard* the law firm argued it obtained the client's informed consent to the dual representation through a broad advance conflict waiver in the engagement agreement that did not disclose any particular conflict or mention the firm concurrently represented the public entity. (*Sheppard*, *supra*, 6 Cal.5th at pp. 80-81.) The Supreme Court rejected the law firm's argument, stating "the conflicts waiver here was inadequate" under former rule 3-310(C) because it did not disclose "that a current conflict *actually* existed." (*Sheppard*, at p. 84.) The Supreme Court observed several federal courts applying California law had "declined to enforce blanket advance waivers on grounds they insufficiently disclosed the conflicts of interest," but the Supreme Court stated that, "[b]ecause we deal here with disclosure and waiver of a known *existing* conflict, we do not decide whether these decisions are correct." (*Id.* at p. 86, fn. 9.) Because McGrath Kavinoky does not argue it obtained informed written consent from Doe 1 or Doe 2 through a blanket advance waiver, the enforceability of such waivers is not at issue here.

Finally, McGrath Kavinoky argues the BASF Ethics Opinion, which concludes a lawyer should disclose potential conflicts arising from joint representation, does not apply because it analyzes joint representation of clients "in a single action," not representation of multiple clients in separate actions against the same defendant. However, the potential conflicts that exist when a lawyer represents multiple clients suing the same defendants for similar injuries, including the possibility all clients will share in an aggregate settlement, are present where the lawyer files separate actions. Indeed, the ABA Ethics Opinion states aggregate settlements should be treated the same, whether they arise "in the common representation of multiple parties in the

21

same matter" or "in separate cases." (ABA Ethics Opn., *supra*, at p. 3; see *ibid.* [Model Rule 1.8(g) "would apply to claims for breach of warranties against a home builder brought by several home purchasers represented by the same lawyer, even though each claim is filed as a separate lawsuit and arises with respect to a different home, a different breach, and even a different subdivision."].) The ABA Ethics Opinion also states that, before agreeing to represent multiple clients in the same matter or in separate cases, a lawyer should discuss the risk some clients may be more willing than others to accept a settlement offer. (See *id.* at p. 3, fn. 5 [neither Model Rule 1.8(g) nor [former] comment [13] "explicitly restricts the application of Rule 1.8(g) to common representation of multiple clients in the same matter"].)

4. *The Arbitration Provisions Are Not Severable*

McGrath Kavinoky argues that, even if the engagement agreements are unenforceable, the arbitration provisions are severable and enforceable. McGrath Kavinoky forfeited this argument by not raising it in the trial court. (See *Cook v. University of Southern California* (2024) 102 Cal.App.5th 312, 325 [appellant forfeited an argument by failing to raise it in the trial court].)

Forfeiture aside, the argument fails under *Sheppard*. As the Supreme Court explained, "while a claim that a single provision of a contract is illegal ordinarily has no bearing on the validity of the parties' agreement to arbitrate, the same is not true of a claim that the entire contract is void for illegality. In such cases, we have said, the agreement to arbitrate cannot be severed from the remainder . . . ." (*Sheppard, supra,* 6 Cal.5th at p. 78.) As with the law firm in *Sheppard*, McGrath Kavinoky's

"ethical breach renders the engagement agreement unenforceable in its entirety." (*Id.* at p. 87.)

The cases McGrath Kavinoky relies on did not involve agreements that were unenforceable in their entirety. Instead, McGrath Kavinoky cites cases where courts held unenforceable provisions could be severed from otherwise enforceable agreements. (See *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1076 ["arbitration agreement is enforceable once the unconscionable appellate arbitration provision is deleted"]; *Calvert v. Stoner* (1948) 33 Cal.2d 97, 103-104 [attorney could collect a contingent fee, notwithstanding an unenforceable provision in the fee agreement prohibiting the client from settling without the attorney's consent]; *Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1976) 64 Cal.App.3d 899, 906 [arbitration agreement "appears to be severable from the incorporation of" unenforceable rules].)

McGrath Kavinoky also cites *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, where the Supreme Court held "claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) will be deemed subject to arbitration." (*Id.* at p. 323.) *Ericksen* is distinguishable because Does 1 and 2 argue that the engagement agreements are unenforceable as against public policy, not that they were fraudulently induced. In *Ericksen* and *Sheppard* the Supreme Court distinguished between cases (like this one) that involve claims an entire agreement is illegal and cases that involve claims of fraud in the inducement. (See *Sheppard*, *supra*, 6 Cal.5th at p. 76 ["'garden-variety "fraud in the inducement"' claims 'related to performance failure' are 'ideally suited for the

23

arbitrator's expert determination'"]; *id.* at p. 77, fn. 4 [in *Ericksen* the Supreme Court held "fraudulent inducement in the making of the contract, as distinguished from illegality, is not a ground for vitiating an arbitration agreement contained therein"]; *Ericksen*, at p. 316, fn. 2 ["The illegality cases are distinguishable."].)

## DISPOSITION

The order denying the motion to compel arbitration is affirmed.  Does 1 and 2 are to recover their costs on appeal.


SEGAL, Acting P. J.


We concur:



FEUER, J.



STONE, J.